UNITED STATES, Appellee

v

ROY T. DUNNAHOE, Private E–2, U. S. Army, Appellant

6 USCMA 745, 21 CMR 67

747

748

No. 6740

Decided March 30, 1956

*Guy Emery, Esquire,* argued the cause for appellant, Accused. With him on the brief were *Lieutenant Colonel James M. Scott, Lieutenant Colonel Harley A. Lanning,* and *Captain Jack G. Van Deventer.*

*First Lieutenant Edward S. Nelson* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

This appeal reaches us under the mandatory review provision of Article 67 (*b*) (1) of the Uniform Code of Military Justice, 50 USC § 654, inasmuch as the accused was convicted[1] of premeditated murder, and the sentence, as approved by the convening authority and affirmed by a board of

[1] CM 377296.

review in the office of The Judge Advocate General, United States Army, extends to death. Appellate defense counsel have assigned several errors and a fair discussion of them requires a general recital of the gruesome facts surrounding the commission of the offense.

The accused spent the greatest part of the afternoon of July 14, 1954, in

gasthauses near the Schleissheim Forest, Munich, Germany, where he reputedly consumed several beers. Sometime during that afternoon, he entered the Forest and his asserted reason was that he intended to locate a prostitute. However, before finding a woman, he changed his mind and decided to return to the city. It was on his return journey that he first saw the decedent, thirteen-year-old Wilhelm Seiber, a German national who lived with his parents in the immediate vicinity. After pausing to talk briefly with the boy, the accused continued on his way, but observed that Seiber was apparently following behind. Then, according to the accused, the boy "started grinning like he was making fun of me or something." This angered the accused, and he struck the boy, knocking him to the ground. As the victim attempted to flee, he was pursued, caught, and felled again. In explanation of this battery, the accused stated he had concluded "I might as well hit him a couples of more times. I would get just as much punishment as if I only hit him once." At this point and without reason or excuse the accused killed the boy by means of a pocket knife and proceeded to mutilate his body in a manner that almost defies description. When the body was discovered it disclosed numerous knife wounds on the head, neck, chest and back; the abdomen was ripped open, the boy's intestines were protruding, and the genitals had been cut off.

When the accused returned to his camp, he was observed to be hatless, disheveled, and to have blood upon his face and clothes. He then took a shower and went to bed. Subsequent tests made of the blood found on his clothing indicated it to be of a type similar to the decedent's. His missing cap was found a short distance from the body, and the tip of a knifeblade, with an eyebrow from the body of the victim encrusted thereon, was found nearby. A pocket knife similar to one purchased by the accused was found near the camp where accused was stationed and the knife-blade tip previously discovered fitted exactly with the broken blade of the knife so found.

Upon being interviewed regarding his part in the offense, the accused signed two pretrial statements confessing its commission, both of which were subsequently introduced into evidence. The first statement indicated that he had killed the victim under the delusion that the object he was stabbing was, in fact, a bear, and the subsequent mutilation was explained to have been done in an attempt to prevent the meat from acquiring a "rank" or "oderly [sic] taste." The second statement contained the facts surrounding the homicide substantially as they have been related.

At the trial, the accused did not testify on the merits, but he sought to raise an issue of mental responsibility, for he stated from the witness stand that he believed there might be a history of mental illness in his family; that his mother had been subject to spells of nervousness; and that he, himself, had experienced "spells" after which he could remember nothing of the circumstances, but during which he almost inevitably committed a wrongful act. However, he said nothing concerning his remembrance of the events surrounding this tragedy.

Following the accused's testimony, the prosecution called a qualified Army psychiatrist, for expert testimony on the question of accused's sanity. The doctor testified that the accused was legally sane; that he could tell right from wrong and adhere to the right; that he possessed no mental defect, disease or derangement and that the encephalographic tracings were normal. However, clinical observations personally made by the witness indicated that the accused was suffering from a longterm character disorder. This disorder was typified as an "aggressive reaction," and because of its presence, the doctor concluded that the accused would be more likely than a completely normal individual to "respond explosively in the face of what would be a mild provocation." In essence, the doctor testified that the accused was suffering from a character defect which, while not disabling him from effectively distinguishing right from wrong, indicated a diminution of capacity to control his

responses even though he shared commonly accepted standards of morality.

## II

Appellate defense counsel first contend that the evidence is insufficient to support the finding of ▌ the court-martial that the accused was sane at the time of the alleged offense. There is no merit in this contention. Prior to trial, the accused was examined by competent experts and found to be mentally responsible for his acts. The only psychiatrist who testified at the trial stated that tests and examinations led unerringly to the conclusion that the accused was sane. This psychiatrist had participated as a member of a board of medical officers which had found no evidence of psychotic disorganization or mental deficiency. It was his considered opinion that the accused was, at the time of the offense, free from any mental defect, disease, or derangement; was able to distinguish right from wrong; and could adhere to the right. If there is any evidence to the contrary, it must be found in his statement that the accused suffered from a character defect diagnosed as an "aggressive reaction," and the accused's own testimony that he has had dizzy spells and loss of memory in the past.

For the purpose of this part of our discussion, we will assess the medical testimony that the accused was sane as inconclusive, and arbitrarily assume that the issue of legal insanity was raised by the meager testimony mentioned. But that assumption is of small comfort to the accused, for the issue was decided adversely to the accused by the court-martial under appropriate instructions. The law officer informed the court members that sanity was in issue, and he gave them complete instructions concerning their duty to return a finding of not guilty unless they were convinced beyond a reasonable doubt that the accused was mentally responsible for the homicide. Furthermore, by his charge to the court, he placed the burden of establishing the sanity of the accused squarely upon the Government. In the light of those instructions, and the quantity and quality of the evidence to support the finding of sanity, there is no merit to the contention that the finding on that issue should be reversed.

## III

The next assignment of error raises the only issue bearing extended discussion. It is most difficult to view with sober objectivity the mental responsibility of an accused who commits an offense which is so ghastly and inhuman as the one portrayed by this record. At first glance, one tends to suppose that the perpetrator must be insane by any and all standards. But upon more mature reflection, it ▌ is realized that savagery alone does not show a lack of mental responsibility. In view of accused's maniacal behavior, the law officer must have elected to assume legal insanity was in issue, for he instructed on its effect on criminal accountability. However, that procedure may have been adopted out of an abundance of caution for the rights of the accused, as we find no evidence which would reasonably raise that issue under military law. However, the accused goes on to complain because the law officer did not instruct sua sponte on the separate issue of whether accused's character disorder impaired his capacity to form the specific intent to premeditate. For reasons which will hereinafter appear, we reach the conclusion that accused has legal grounds for complaint, but only to a minor degree.

We begin with the initial premise that if there is testimony which raises reasonably an issue concerning mental impairment ▌ less than legal insanity— as distinguished from a character disorder—which casts doubt on accused's capacity to premeditate or to form a specific intent to kill, the law officer has a duty to instruct on that issue. It is the law of this Court that such a mental condition could serve to negate effectively the presence of premeditation. United States v Higgins, 4 USCMA 143, 15 CMR 143. Cf, United States v Holman, 3 USCMA 396, 12 CMR 152. As we said in United States

v Kunak, 5 USCMA 346, 361, 17 CMR 346, 361:

"This brings us to an error which we conclude is fatal to the findings and sentence on premeditated murder . . . The instruction on premeditation . . . is deficient, for the purpose under consideration . . . The law officer nowhere suggested the important principle that mental impairment, less than legal sanity, might be considered by the court-martial members when they were deliberating upon the element of premeditation. Significantly, [the issue having been reasonably raised] missing in this case is an instruction to the effect that if in the light of all evidence the court-martial has a reasonable doubt that the accused was mentally capable of entertaining the premeditated design to kill involved in the offense of premeditated murder it could find the accused not guilty of that degree of the crime."

In that case we were presented with evidence from expert witnesses which would have supported a finding that the accused was legally insane. Two eminent authorities diagnosed him as being a paranoid schizophrenic. Certainly, we were there concerned with a mental defect, disease, or derangement as defined in standard psychiatric works and as used in the Manual for Courts-Martial, United States, 1951. Here, the issue requires different treatment, as the medical testimony does not establish any psychotic or psychoneurotic disorder. The most that we find in this record is medical testimony that the accused is a volcanically explosive individual who is free from any mental illness. The defect in accused's condition was determined by the doctor to be an aggressive reaction, which, according to his testimony and SR 40–1025–2, June 25, 1949, Joint Armed Forces Nomenclature and Method of Recording Psychiatric Conditions, is a character or behavior disorder. Conceding that considerable difficulty is encountered in drawing a line of departure between a psychosis or psychoneurotic disorder, and a character or personality disorder, courts must rely on the expert witness to make these refined distinctions, because lay witnesses are not qualified to catalogue the borderline cases and even experts often disagree in that field. It has been said that criminalism itself may be interpreted as a form of personality disorder, Weihofen, Mental Disorder as a Criminal Defense, page 12, but neither military nor civilian law accepts that condition as a defense to an allegation of crime. Similarly, courts are not entitled to punish those who are legally insane. There is, however, an in-between "gray" area which encompasses certain recognized psychiatric conditions of such a degree as not to reach legal insanity. It is when an accused is diagnosed by the expert as being in those areas, that difficulties are encountered in determining the effect of the deficiency in criminal law.

In previous cases we have been unwilling to permit character disorders to be considered as a complete defense to a murder charge, believing that the Manual for Courts-Martial, United States, 1951, forbids such a course. Quoting again from United States v Kunak, supra, we had this to say on that subject:

"Without going into the military necessities which might influence us in not adopting the new test in the Durham case, we are confronted with a Manual provision which compels a different approach to the problem. We are required to follow the provisions of the Manual for Courts-Martial, United States, 1951, unless they cover fields outside the authority of the President, offend against the Code, or are contrary to well-recognized principles of law applied in the Federal courts. Of course, a court has the inherent power to determine whether an accused is mentally competent to stand trial. Particularly is this true if Congress has not legislated on the subject. However, in the military the President has, over the years, promulgated the principles governing, and the manner of proceeding with, the defense of insanity. We need not decide wheth-

752

er the delegation of power to him by Congress, or its long acquiescence in his assumption of authority to legislate on the subject of insanity, sustain the present provisions. We need only say that, under present circumstances, we are not disposed to disagree with the tests he prescribes. In a number of recent cases we have placed our stamp of approval on them and we are satisfied they offer a good working formula for courts-martial. If an accused has the mental ability to know an act is wrong and can refrain from committing it, good arguments can be advanced as to why he should be punished. However, if, in the future, conditions in the Armed Services justify a change in our philosophy, or if Congress sees fit to prescribe a different test for determining insanity, then we will modify our views. But at the present time we prefer to follow the military law as it is expounded in our 'Bible.' "

In that instance we recognized and approved the test for mental responsibility set out in the Manual and we reaffirm it in this case. However, in paragraph 120*b*, we find another rule which sheds light on the somewhat different principle posed in this case. It is set out in the following language:

". . . Thus a mere defect of character, will power, or behavior, as manifested by one or more offenses, ungovernable passion, or otherwise, does not necessarily indicate insanity, even though it may demonstrate a diminution or impairment in ability to adhere to the right in respect to the act charged."

In TM 8–240, "Psychiatry in Military Law," paragraphs 13*a* and *c,* we find fairly well-identified the character disorders spoken of in the Manual. While they represent a variety of adjustment states, it appears reasonably certain from their descriptions that some border upon being of psychotic or psychoneurotic proportions, while others may approach normalcy. A psychoneurotic disorder, if of sufficient severity to impair totally an accused's capacity to distinguish right from wrong or adhere to the right, is recognized as enough to establish mental irresponsibility. Those states bordering on normalcy may have no effect on the mind. But most of the individuals who are placed in the character disorder class of affected persons would fall between the two extremes. The above cited subparagraph from the Technical Manual identifies some of the character disorders, and if we interpret it correctly, the word "accountability" is used as a synonym for responsibility:

"*a.* Character and behavior disorders, under whatever name designated, do *not* impair the accused's criminal accountability. These disorders are known variously as pathologic personality, constitutional psychopathy, psychopathic personality, and by several other names and under numerous subtypes. This is precisely the kind of condition which is considered a 'defect of character, will power, or behavior' in paragraph 120*b,* MCM, 1951.

. . . . .

"*c.* In appraising an individual with character or behavior disorder, therefore, the medical officer should bear in mind certain considerations. The disorder here is one of 'moral' rather than 'mental' faculties. It may be that this is not the 'fault' of the individual; perhaps he was born that way. Nevertheless, this defect of conscience is the 'moral' faculty referred to in MCM, 1951."

Having refused to follow the rule that character disorders may be complete defenses to a crime, but realizing they may be an important factor to be considered in defending against many offenses, we are brought to the nub of this case. That is, should a deficiency of that nature be considered by the court-martial for the purpose of determining whether the accused has the capacity to premeditate when he is charged with the offense of premeditated murder? Stated somewhat differently, while a character or behavior disorder cannot be used as a complete defense to a charge of murder, may it be taken into account as evi-

dence tending to reduce the crime from premeditated to unpremeditated murder? We have concluded it can, provided there is testimony which establishes that its nature and severity is such that the disorder may have interfered with the accused's capacity to contrive and design.

We will first consider the issue presented by this case in the abstract and then discuss the evidence before us. As a starting point and to illustrate the dilemma we find in this field, we quote an appropriate expression from Forensic Psychiatry by Davidson. In dealing with criminal responsibility, he has this to say (page 21):

"Legally, there is a vast gulf between disorders of thinking and feeling (such as psychoses and mental deficiency), on the one hand, and 'disorders of character' on the other. Society assumes that alcoholism, sexual perversion, drug addiction, and psychopathy are disorders of character—and often refers to these as 'deviations of moral faculties.' The psychiatrist thinks of alcoholism, homosexuality, psychopathy, and the like as 'sicknesses' in the same sense that hysteria or schizophrenia is a sickness. However, society, speaking through the law, insists on segregating the two groups of disorders. Nor is this an unreasonable demand. There does seem to be some force corresponding to the 'conscience,' and patients with character disorders do seem to have a less effective 'conscience' than psychoneurotics."

The military community may be equated in a limited sense to the society spoken of by Davidson, as we find that alcoholism and psychopathy have been classified as character or behavior disorders in SR 40–1025–2, Joint Armed Forces Nomenclature and Methods of Recording Psychiatric Conditions, supra.

In previous holdings, we have placed our stamp of approval on the doctrine that voluntary intoxication, not amounting to legal insanity, may raise an issue of the capacity to premeditate, if the state of intoxication reaches a degree which would interfere seriously

with the mental processes. United States v Craig, 2 USCMA 650, 10 CMR 148; United States v Ransom, 4 USCMA 195, 15 CMR 195. No other rational outcome is possible, despite the fact that the accused may be perfectly normal when sober, for actual premeditation must be established, as a factual matter, to support conviction. A fortiori, character disorders of a more permanent character, which render it unlikely that the accused deliberated in a given situation, should be similarly treated. It is certain that arbitrary distinctions must sometimes be made, but the Code establishes different degrees of murder, and premeditation must be proven before an accused can be convicted of the highest degree. It, therefore, is not illogical to assert that whenever an accused is shown to have a condition of the mind which probably would impair his mental capacity to deliberate, the court-martial should be permitted to consider the impairment to determine whether the accused committed the crime with the requisite premeditation.

The Manual for Courts-Martial does not specifically provide that character disorders may be considered for their effect on the capacity to premeditate, but it states they may demonstrate a diminution or impairment in ability to adhere to the right in respect to the act charged. That seems to support the contention that military law recognizes that some mental conditions, catalogued as character and behavior shortcomings, may interfere with the ordinary mental processes to such an extent as to reduce the degree of the offense committed. The contention is not without support in military medical publications, for paragraph 9 of the Technical Manual, "Psychiatry in Military Law," supra, has this to say in regard to mental conditions which, though not amounting to legal insanity, might impair the capacity to premeditate:

"Some offenses consist of an overt act plus intent, wilfulness, or some other state of mind. An accused may have committed an overt act, yet have had a mental disorder which robbed him of the ability to enter-

tain the intent or state of mind required by the offense charged. . . . Here, too, the accused by reason of some mental disorder, might be incapable of the required premeditation, though capable of having intent to kill or inflict great bodily harm (par. 197, MCM, 1951). Thus, the medical officer does not discharge his full duty when he reports on the sanity of the accused in general. He must be prepared to say whether the defendant's mental state was such that he was capable of having the degree of intent, wilfulness, malice, or premeditation which the law requires for determination of guilt or for a certain degree of guilt."

We believe it worth noting that the phraseology of this paragraph is slightly different from other paragraphs in the Technical Manual in that the phrase "mental disorder" is substituted for mental disease, defect or derangement. That substitution alone would be insignificant, but when it is considered in relation to other parts of the Technical Manual, the thrust of all the provisions is toward a recognition that character defects may be considered for the limited purpose of reducing premeditated murder to unpremeditated murder. Certainly, there is logic to that position, for a person may not be found guilty of a deliberate and premeditated murder if, at the time when the homicide occurs, he is incapable, for any reason, of deliberating and premeditating.

We have previously quoted provisions of the Technical Manual which show that the disorders identified as pathological personality, constitutional psychopathy, and psychopathic personality, are considered in military law as defects of moral character. However, that medical Manual goes on to state that those disorders are diseases of the "mind" for the purposes of technical medical classification. It is to be noted, too, that military doctrine does not deny that they might impair substantially the capacity to premeditate. At the worst, it does not affirmatively proclaim such a theory, but the wording of the Manual can be interpreted to accept what has been a recognized theory of reducing the degree of the offense or the punishment imposable. Certainly, we have found numerous medical and legal authorities, including the Supreme Court, which accept the doctrine that while a person diagnosed as a psychopathic personality does not have a disease of the "mind," as understood in law, which would entitle him to an acquittal, his particular impairment may be considered for its effect on the element of premeditation. Fisher v United States, 328 US 463, 66 S Ct 1318, 90 L ed 1382 (1946) ; TM 8–240, supra.

To point out one reason why we conclude the military legal doctrine does not diverge from the more recent psychiatric doctrine, we quote from a recognized civilian authority and then repeat part of a previous quote from the military psychiatric manual. The similarity in wording which is emphasized suggests similarity in doctrine. In Forensic Psychiatry by Davidson, on page 9, it is stated:

"In this connection, Glueck says: 'The courts of at least two states have had sufficient vision to cope with the problem of the semi-irresponsible.' The states referred to are Utah and New Jersey. In Utah, a court has said, 'A person's mental condition may not be such as to make him irresponsible yet it may be such as to relieve him from the supreme penalty;' while the New Jersey decision reads: 'If the defendant was so feeble-minded as to be incapable of forming the specific intent to kill with its willful and deliberate character, then his offense would be murder in the second degree.'

"The examiner should understand this concept clearly, since a man's life may depend on it. The psychiatrist is not finished when he decides simply that the accused is or is not psychotic. He *must be prepared to say whether the defendant's mental state was such that he was capable of having the degree of intent, willfulness, deliberateness, or premeditation which the law might require for the offense.* This is particularly true

**755**

of crimes committed by psychopaths during rages or by drunkards during periods of acute intoxication." [Italics supplied.]

"Psychiatry in Military Law," paragraph 9, states:

". . . Thus, the medical officer does not discharge his full duty when he reports on the sanity of the accused in general. *He must be prepared to say whether the defendant's mental state was such that he was capable of having the degree of intent, wilfulness, malice, or premeditation which the law requires for determination of guilt or for a certain degree of guilt.*" [Italics supplied.]

We know of no good reason why military law should not embrace principles which keep the courts-martial abreast of medical science, particularly when the military medical service advances compelling reasons for their adoption. It always has done so and no one suggests that discipline will be affected by common sense and the logical application of medical theories. Certainly courts-martial need not shy away from a clear statement of what is a scientifically established fact, and is implicit in the present Manual for Courts-Martial. Weihofen, on pages 178–179, of his work "Mental Disorder as a Criminal Defense," supra, offers a reason why the military services need not accept the dogmatic view that because an accused is not legally insane, his mental condition is of no importance to a proper finding on the degree of the offense. He states his views in the following language:

"To the psychiatrist no less than to the man in the street the distinction between the mental state deemed so reprehensible as to make killing properly a capital offense and a mental state that seems to call for a lesser punishment is no mere 'refinement' but a very real and significant distinction. It is true that the psychiatrist would not regard 'premeditation' and 'deliberation' as words well suited to express this distinction. Like a number of other legal terms, they express concepts stemming from the days of 'faculty psychology,' when mental processes were neatly tagged as belonging either to the 'will,' the 'reason' or the 'emotions.' With increasing understanding of the mental processes, we are coming to realize that conduct is not merely a matter of reasoning and willing. The emotions and needs—fear, anger, the desire for power or gain—are driving forces much more potent than we formerly recognized. The mind (using that term as a generic one to denote the way in which the human organism adapts itself to situations) cannot be considered apart from the body; and therefore not only heredity, early environment, education and native intelligence, but also the physical state, the functioning of the ductless glands, and the presence of infection or intoxication, all play a part in determining the reaction of the individual to any given circumstance. Conduct or response to situations depends in considerable measure on the temperament of the actor, the development of his inhibitions, his ability to look ahead to consequences as opposed to impulsive action, and therefore on his behavior patterns, his intelligence, and the soundness of his central nervous system. Any of these factors may help the degree to which planning or intellection (premeditation and deliberation) can be applied to a situation and in many conditions short of 'insanity' these elements may be psychologically important."

While we need not accept fully the philosophy of the psychiatrists in all of its aspect, we believe the thoughts expressed in the foregoing quotation underlie the provisions found in the medical and court-martial manuals. Certainly, the state of mind with which a person commits a criminal act is material in determining whether he should be punished therefor, and, if so, how severely. Moreover, whenever a person suspected of an offense is given a psychiatric examination, the officers composing the board are enjoined to answer seven questions. One of the questions is this: Was the accused capable of forming the degree of in-

tent, wilfulness, malice, or premeditation called for by the nature of the offense charged? See Psychiatry in Military Law, supra, paragraph 18, page 23. Unfortunately we find the medical examiners, expert witnesses and attorneys too often overlooking this important matter. As a result, when some evidence of a personality disorder is introduced into evidence in a proper case, courts-martial are left to grapple with the subject without instructional guideposts, and with only the tests for mental irresponsibility given. Expert witnesses are seldom asked to express an opinion except on legal insanity, and we believe the cavalier treatment accorded the subject of diminution of capacity, which we find in many records, is not in keeping with the consideration given to the subject of insanity by the military services. Therefore, in line with what we believe to be the doctrine announced in the Manual for Courts-Martial, Psychiatry in Military Law, and the better reasoned civilian cases, we conclude that character disorders as defined in the military medical manuals and regulations should be considered in measuring a person's mental ability to premeditate. For those who are concerned about the effect of this rule, we need only say that the careful preparation of the pretrial psychiatric reports by the medical service and the proper presentation of the subject at trial will assure conviction in all cases where a finding of guilt is appropriate.

Our holding above finds substantial support in Fisher v United States, supra. There the Supreme Court was dealing with a defendant who was diagnosed as being a psychopathic personality. The trial court refused to give an instruction on "partial insanity" and while the Supreme Court refused to reverse for reasons not material to this decision, implicit within the various opinions is the concept that a character disorder may negate premeditation. For our purpose here, we select the following language from the dissenting opinion of Mr. Justice Murphy:

"More precisely, there are persons who, while not totally insane, possess such low mental powers as to be incapable of the deliberation and premeditation requisite to statutory first degree murder. Yet under the rule adopted by the court below, the jury must either condemn such persons to death on the false premise that they possess the mental requirements of a first degree murderer or free them completely from criminal responsibility and turn them loose among society. The jury is forbidden to find them guilty of a lesser degree of murder by reason of their generally weakened or disordered intellect.

"Common sense and logic recoil at such a rule. And it is difficult to marshal support for it from civilized concepts of justice or from the necessity of protecting society. When a man's life or liberty is at stake he should be adjudged according to his personal culpability as well as by the objective seriousness of his crime. That elementary principle of justice is applied to those who kill while intoxicated or in the heat of passion; if such a condition destroys their deliberation and premeditation the jury may properly consider that fact and convict them of a lesser degree of murder. No different principle should be utilized in the case of those whose mental deficiency is of a more permanent character. Society, moreover, is ill-protected by a rule which encourages a jury to acquit a partially insane person with an appealing case simply because his mental defects cannot be considered in reducing the degree of guilt."

IV

Having concluded that character disorders may raise an issue of an accused's capacity to premeditate, we move on to ascertain whether this record contains sufficient evidence to charge the law officer with the duty of instructing sua sponte on that theory. An accused is presumed to be sane, and he is likewise ▪ presumed to be capable of premeditation. Therefore, unless the record establishes some impairment of the ability to deliberate,

the accused cannot complain because no instructions were submitted. True it is that this law officer gave instructions on insanity as a complete defense, but we have previously indicated that he may have been impelled to do so out of a sense of liberality to the accused. The fact that an instruction ▮▮▮▮▮ was given does not supply the evidence to raise an issue. We must, therefore, scan the record to ascertain whether there was a bona fide issue of diminution of capacity to premeditate. From our recitation of facts, it ▮▮▮▮▮ is apparent the record contains evidence that the accused was suffering from a character disorder known and identified as an "aggressive reaction." However, the difficulty we encounter is that this diagnosis, without some further development, does not make it possible for us to determine the severity of the disorder or its effect on accused's mentality. The record is absolutely silent as to whether the impairment was of sufficient seriousness to render the accused less capable of understanding the wrongfulness of his act or less able to control his impulses than would any normal person. According to the doctor, the accused could distinguish right from wrong and he could adhere to the right. The doctor thus fixed legal sanity, but continued to state that the accused was likely to explode in the face of mild provocation. We are thus confronted with medical testimony which shows a mental condition somewhere between legal insanity and normalcy. However, nothing was presented to link the condition of the accused to the facts of this case. Moreover, nothing was said as to whether the innocuous acts done by this victim, if any, would be likely to provoke the accused. When we look to medical authorities for assistance in determining the nature and psychological effect of the identified disorder, we find the following characteristics set out in paragraph 6b(4), Joint Armed Forces, Nomenclature and Method of Recording Psychiatric Conditions:

"*Aggressive Reaction.*—A persistent reaction to frustration with irritability, temper tantrums, and destructive behavior, is the dominant factor in such cases. A specific variety of this reaction is a morbid or pathological resentment. Below the surface, a deep dependency is usually evident in such cases. The term does not apply to cases more accurately described by the term 'antisocial personality' (par. 5a)."

The definition fails to supply the essential information needed to form an intelligent opinion as to this accused's capacity to premeditate. The lack of testimony in this case becomes more pronounced when consideration is given to the factors which play a part in determining the reaction of the individual to any given circumstances. They can be much better evaluated by personal observation and examination of the particular accused by the medical examiner. To point up the hiatus, the accused in his pretrial statement asserted that he became enraged because the victim laughed. If we assume that the described reaction is consistent with the diagnosis of aggressive reaction, severe, we are still unable to say with any degree of assurance that the disorder which caused him to react aggressively to such a minor provocative act would be likely to negate premeditation. We must leave that field to the psychiatrists.

There is evidence of premeditation which is ample to support the finding, such as accused's admission that he struck his victim several times because it would not increase the punishment he could expect for the first blow, and his statement that he had already stabbed the boy before he "saw red." Accordingly, Judge Quinn would affirm the conviction and sentence, and I would join him, if it were not for the fact that the death penalty was imposed. There is sufficient medical evidence of some sort of psychiatric condition to cause me to wonder if any consideration was given to the issue of whether it was of such a nature as to affect premeditation. I am under the impression that, for the most part, military lawyers have interpreted the law to exclude

the principle we here enunciate. While the law officer mentioned it obliquely when he was instructing on legal insanity, his language was ambiguous and it is doubtful that the court members gave thought to any condition other than legal insanity. Even assuming they did, I am convinced the board of review limited its consideration solely to criminal responsibility. In the usual situation, if an accused fails to point out, on appeal, some evidence of insanity in the record, he cannot complain because his mental derangement was not submitted to the court-martial for determination. Furthermore, unless he can show facts from which it could be found reasonably that his character disorder impaired his mental capacity to premeditate, he cannot complain because that issue was not considered. In this instance, for reasons previously mentioned, I have grave doubts that the testimony of record reached the minimal limits necessary to raise the issue, but because I am uncertain on that score, I conclude it is inadvisable to affirm the findings and sentence. I do not believe, however, that the issue need be returned to a trial forum, as, by directing a reconsideration by a board of review under the conditions later set out, we are granting to the accused all, if not more, rights than he is legally entitled to receive. Judge Quinn is of the opinion that no issue was raised, but he is willing to give way in order to dispose of the case.

## V

The law officer's instruction with respect to intoxication forms the basis for the next two alleged errors. In connection with that defense, the law officer informed the members of the court-martial:

"In this case there has been some indication that the accused may have consumed intoxicating beverages shortly before the time of the offense alleged in the specification is alleged to have been committed and that the accused may have been intoxicated to some degree at the time of the alleged offense. You are advised that a temporary loss of reason which accom-

panies and is part of a drunken spree and which is not the result of delirium tremens or some other mental defect, disease, or derangement, is not insanity in the legal sense. It is a general rule of law that voluntary drunkenness not amounting to legal insanity, whether caused by liquor or drugs, is not an excuse for crime committed while in that condition; but such drunkenness may be considered as affecting mental capacity to entertain the premeditated design to kill or a specific intent when it is a necessary element of that offense. Evidence of drunkenness should be carefully scrutinized as drunkenness is easily simulated or may have been resorted to for the purpose of stimulating the nerves to the point of committing the act."

It is first claimed that error was committed because the law officer refused to include in the instruction the more elaborate requested charge offered by defense counsel at the trial. In view of the fact that the first paragraph of the requested instruction embodies the identical concept set out in the instruction given, we set out only the parts we consider in dispute. These are as follows:

"There is other evidence in this case which you may properly weigh with or against the evidence of voluntary drunkenness in determining the accused's reasoning ability, such as the evidence of the accused's muscular coordination immediately before and immediately after the alleged offense, the accused's ability to speak coherently shortly after the offense, the accused's apparent lack of concern for himself shortly after the alleged offense, the accused's failure to conceal the body of the alleged victim, the accused's failure to obtain or conceal certain real evidence which tended to connect him with the alleged offense, the accused's statements to fellow soldiers made shortly after the alleged offense, and the accused's ability later to remember certain of the details surrounding the alleged offense.

"If, in the light of all the evidence,

**759**

you have a reasonable doubt that the accused was mentally capable of entertaining the premeditated design to kill involved in the offense of premeditated murder, you must find him not guilty of that offense."

An inspection of the quoted portions of the request discloses that it contains many evidentiary items ▆▆▆▆▆▆ that defense counsel at trial insisted should have been specifically brought to the attention of the court-martial, considerations which might have had relevance to the question of specific intent. The vice of the requested instruction is that it singles out bits of evidence and emphasizes them to the exclusion of others. An accused may not isolate particular facts of the case favorable to him and demand that the law officer give undue prominence to them. Neither may he, by suggesting some facts, require the law officer to summarize every fact for or against every issue. United States v Harris, 6 USCMA 736, 21 CMR 58. With the exception of the character disorder previously discussed, the court-martial, under appropriate instructions, determined beyond reasonable doubt that the accused possessed sufficient reasoning ability at the time of the offense to premeditate. In addition, the triers of fact were made well aware of their duty to weigh the facts and the credibility of the witnesses. Both parties are entitled to have their theories considered, uninfluenced by instructions which would accentuate the evidence favorable to either; therefore, the refusal of the law officer to honor such a request was entirely correct.

The next assigned error and the second part of the attack on the law officer's instruction with ▆▆▆▆▆▆ respect to intoxication is appellate defense counsel's claim of prejudice in the law officer's comment that "the accused may have consumed intoxicating beverages shortly before the time of the offense alleged" and his further observation that "the accused may have been intoxicated to some degree at the time of the alleged offense." In appellate defense counsel's view these comments are a distortion of the evidence of intoxication, misled the court-martial, and were therefore prejudicial to the rights of the accused.

In United States v Miller, 6 USCMA 495, 20 CMR 211, we were met with a claim that the law officer erroneously commented on the weight of the evidence by characterizing the Government's proof as legally sufficient to convict. We there noted the military rule, derived from accepted Federal practice, that a law officer may comment on the sufficiency of the evidence and that "no harm can have been done, if it appears that cautionary limitations were later placed on that comment." In holding that the law officer did not err, Judge Brosman, writing for a unanimous court said:

"Were such danger signals in fact raised by the law officer? We are sure that an affirmative answer is required—for, immediately after uttering the remarks now assailed, he instructed the members of the court explicitly and at length concerning their duty to acquit if not convinced of guilt beyond reasonable doubt. In unmistakable terms he reminded the triers of fact that judgments concerning the credibility of witnesses lay within their *exclusive* province. Finally, he erased all doubts that ultimate factual determinations were to be made by the court-martial—and by it alone—when he admonished the tribunal's members that it was their function to weigh the evidence *independently,* and regardless of any comment made by him which might seem to indicate an opinion respecting the guilt or innocence of the accused. When the law officer's phrasing is viewed in conjunction with these subsequent pronouncements, we cannot say that the words chosen by him can have had an erroneous impact on the minds of the members of the court-martial."

In the case at bar the law officer gave the same cautionary instructions and left no doubt that the finders of fact were ultimately to determine whether the accused was intoxicated to such a degree that his ability to premeditate would be affected.

We further note that the law officer's words find support in the conflicting testimony of record with regard to the degree of the accused's inebriation. It is true, as appellate defense counsel asserts, that at least one witness testified that the accused, prior to the homicide, was staggering, unable to hold his head up and "was drunk but he was not very strong drunk." And an acquaintance who saw the accused after the incident observed that the latter appeared to have been drinking and that his eyes were glassy and bloodshot. On the other hand, a guard at the gate through which the accused passed upon his return to his quarters after the killing did not notice any odor of alcohol or evidence of intoxication, but on the contrary noted that the accused walked and talked normally. Moreover, the accused's actions before and after the homicide were not out of the ordinary. Quite clearly, then, the law officer did not misconstrue the evidence when he stated that the accused "may" have been intoxicated. In fact, his comment in this regard left the members of the court-martial free to resolve the conflicts in the evidence. Surely, we cannot say that the law officer erred because he did not instruct the court-martial that the evidence clearly established a state of intoxication sufficient to deprive the accused of reasoning ability.

To correct the deficiency found in this record, we adopt this procedure. The cause is returned to The Judge Advocate General of the Army for reference to a board of review for further proceedings. The board may affirm a finding of unpremeditated murder and such sentence as it deems appropriate; it may order the accused examined as to his mental capacity to premeditate at the time he committed the offense, permitting him, if he so desires, to furnish evidence on that issue, and then reconsider the finding; or it may grant a rehearing.

QUINN, Chief Judge (concurring in the result):

I disagree with a number of the statements made by Judge Latimer. For present purposes I need only point out that in my opinion the military law on the legal effect of a particular mental condition of the accused cannot be determined by the classification of mental disorders in service publications. See my dissenting opinion in United States v Kunak, 5 USCMA 346, 17 CMR 346. I also disagree with Judge Latimer's implication that only the testimony of medical experts is sufficient to create an issue as to the degree of legal responsibility of the accused. See United States v Looff, 4 USCMA 36, 15 CMR 36. I also disagree with his position that the board of review can cure an instructional error by the law officer by taking new testimony in regard to the issue. See United States v Kunak, supra, page 365. However, the evidence does not show any issue as to premeditation. Therefore, I would affirm the decision of the board of review. But, in order to effect a practical disposition of the case, I concur in the result reached by Judge Latimer. See my opinion in United States v Cudd, 6 USCMA 630, 20 CMR 346.