UNITED STATES, Appellee

v

MAURICE L. SCHICK, Master Sergeant, U. S. Army, Appellant

7 USCMA 419, 22 CMR 209

420

No. 6388

Decided December 7, 1956

*William C. Duvalle*, Esq., argued the cause for Appellant, Accused. With him on the brief were *Harlow M. Huckabee*, Esq., and *Lieutenant Colonel James M. Scott*.

*Captain Thomas J. Nichols* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton, Major Merle C. Rideout* and *Captain M. Douglas Hodges*.

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused was convicted by general court-martial of the premeditated murder of eight-year-old Susan Rothschild at Tokyo, Japan, in violation of Article 118, Uniform Code of Military Justice, 50 USC § 712. He was sentenced to death. On May 10, 1954, the sentence was approved by the convening authority. The board of review, by decision dated November 30, 1954, affirmed and approved the death sentence. A mandatory appeal, under Article 67(*b*)(1), of the Uniform Code of Military Justice, 50 USC § 654, was taken to this Court. After the appeal,

**421**

and prior to argument on the merits, appellate defense counsel moved to remand the case to the board of review, or, in the alternative, for a continuance for the purpose of obtaining a civilian psychiatric examination of the accused. This Court granted the continuance and directed that additional findings of the psychiatrist be filed with the Court. The accused was examined by psychiatrists and psychologists of the Menninger Clinic, who submitted their findings by a well-written and comprehensive report dated August 19, 1955. Arguments were heard by counsel on October 6, 1955, and the case was submitted to the Court. By an opinion decided on November 18, 1955 (6 USCMA 493, 20 CMR 209), the Court remanded the case to The Judge Advocate General of the Army for reference to the board of review for additional review with respect to a reconsideration of the accused's sanity. The case was returned to the board of review and oral arguments by the defense and Government counsel were heard on the question of sanity. By decision, dated February 20, 1956, the board of review again affirmed the findings and sentence. Following the final board of review decision the accused filed a supplemental brief listing additional assignments of error. The case was then reargued before the full Court.

The pertinent issues now before the Court are:

1. Whether the law officer erred in refusing to grant further time for additional pyschiatric study.

2. Whether the use of the Army Technical Manual (Tech Manual) TM 8–240, Psychiatry in Military Law, by the court-martial and the board of review precluded its exercise of independent judgment.

3. Whether the law officer's refusal to instruct as requested on the effect of partial mental deficiency upon the ability of the accused to premeditate was prejudicial, and therefore requires a rehearing.

4. Whether the board of review applied the rule cited by it in its opinion that "To justify a reversal circumstances must be such that the verdict shocks the conscience of the court," and therefore committed reversible error.

The record discloses the following facts: During the early evening hours of November 21, 1953, the lifeless body of eight-year-old Susan Rothschild was found by her father. It was lying face down in a moat at Camp Zama, Japan. A medical examination revealed that death had been caused by strangulation or drowning less than an hour earlier. Six days later, to agents of the Criminal Investigation Division of the Army, the accused confessed that he had met Susan, talked with her about ten minutes, and then, as she turned to leave "I grabbed her and choked her." After choking her, he gagged her with her "panties" and dragged her into a ditch. He then put his foot on her head and held her face under the water. The accused had been drinking since about noon that day. The reason for the homicide was "just that she was there." After the deed was done, he experienced a sexual release.

The accused was charged with premeditated murder and the only issue raised before and during the trial was that of sanity. Upon each occasion counsel for the accused attempted to obtain psychiatric examination of the accused by nonmilitary American doctors. Although his efforts with respect to American doctors were unsuccessful, he did succeed in obtaining the services of two Japanese psychiatrists. They were Dr. Takeo Doi, Department of Neuro-psychiatry, Tokyo University Medical School, and Dr. Susumu Hayashi, Superintendent of the Tokyo Metropolitan Matsuzawa Mental Hospital. Both testified at the trial that they had examined the accused, along with all pertinent records relating to his mental responsibility, and, in their opinion, at the time of the offense he was suffering from schizophrenia, and he could neither distinguish right from wrong nor adhere to the right.

Four Army psychiatrists testified for the prosecution. All had examined the accused and had studied the records regarding his mental capacity. Each

testified that the accused was, in his opinion, suffering from a nonpsychotic behavior disorder and accordingly was able at the time of the offense to distinguish right from wrong, to adhere to the right, and at the time of the trial was able to understand the nature of the proceedings against him and co-operate intelligently in his defense.

The additional evidence on the accused's sanity considered by the board of review and now before us is (1) A psychiatric and psychological report from the Menninger Clinic, which classified the accused as suffering from:

". . . [A] definite mental illness characterized by periodic episodes of uncontrolled violence and excitement, interspersed with periods in which he appears either normal or rebellious and anti-social to casual observers. Even in these non-violent periods, there is evidence of the underlying mental illness. In the American Psychiatric Association Standard Nomenclature currently in use, this illness would be classified as, Schizophrenic Reaction, chronic, undifferentiated type, manifested by episodes of transitory dereistic excitement, inappropriate emotional responses, extensive inner fantasy life, perplexity and concern over mental illness, blurring of boundaries between fantasy and reality, impulsive aggressive behavior, with egocentricity and fantasies of omnipotence.

⋅ ⋅ ⋅ ⋅ ⋅

"C. On the basis of our examination of the patient, a review of his history, and a study of his previous medical records, it seems clear he has a mental disease which deprived him completely of the power of choice and volition so that he was unable, concerning the particular act charged, to adhere to the right."

The report concluded,

"Yet, regardless of any disagreement about how sick he is between excited episodes, it seems clear that the offense arose during, and was a manifestation of, an acute psychotic episode. There is a definite history of similar episodes prior to the of-fense, and the examination reveals, in minature [sic], the kind of pathology that can be easily and sometimes unpredictably precipitated into violent episodes. In our opinion, these episodes will recur in the future. Unfortunately, present day psychiatric treatment techniques offer nothing for this man, and we would have to consider him, at this time, permanently and incurably ill. As psychiatrists, we simply have to say that this man is dangerous to society, and will remain so for many years, probably all of his life. He should not be released to society unless there is clear cut evidence of major change for the better in those pathological psychological processes demonstrated to be present."

(2) A statement, based upon the trial record and medical reports, from Dr. Winfred Overholser, Superintendent, St. Elizabeth's Hospital, Washington, D. C., wherein he announces the opinion that it is doubtful whether the accused could distinguish right from wrong at the time of the offense; however, he has no doubt but what the accused was *unable* to adhere to the right and could not have premeditated with regard to the offense charged. But the accused *could* understand the nature of the trial and appellate proceedings against him; *could* cooperate intelligently in his defense; (3) A statement from Dr. Manfred S. Guttmacher, Chief Medical Officer of the Supreme Bench of Baltimore, Maryland, in which he notes that the accused's conscious controls are profoundly affected by alcohol. Dr. Guttmacher did not, however, designate the accused as being a paranoid schizophrenic, but rather as suffering from "profound character neurosis, with periods of psychotic-like behavior, particularly when imbibing alcohol." He "inclined" toward the view that the accused was able to distinguish right from wrong but was *unable* to adhere to the right. He points out that in this area judgments are extremely difficult to make and if present military medical criteria were applied, the accused should "probably be considered responsible"; (4) A report from The Surgeon General of the Army, dated

January 9, 1956, in which he reviews the Menninger Report and previous material relating to the sanity of the accused. In the opinion of The Surgeon General, the accused could distinguish right from wrong, could adhere to the right, and possesses sufficient mental capacity to understand the nature of the proceedings against him.

After reviewing the additional information as to the accused's sanity, the board of review again ▆▆▆▆▆▆▆ found the accused mentally responsible for his acts. The conviction was affirmed. There was substantial evidence to support the board's finding, and, therefore, this Court cannot find that as a matter of law the board erred. United States v Bunting, 6 USCMA 170, 19 CMR 296.

The accused argues that his rights were prejudiced by the refusal of the law officer to allow him ▆▆▆▆▆▆▆ time for additional psychiatric study. Perhaps it would have been more appropriate to have granted the accused additional time for examination by the Japanese psychiatrists, but we cannot say that under the circumstances of this case the accused did not have sufficient time to prepare his defense. From December 1, 1953, to February 6, 1954, a board of medical officers examined the accused, and their report was sent to the defense counsel on February 9, 1954. On the same date the defense counsel requested the commanding officer to send the accused to Topeka, Kansas, to be examined by the Menninger Clinic. February 16, 1954, the defense was informed that its request would not be complied with. However, Government facilities, records on the accused, and Government psychiatrists were available to the accused and counsel. On March 16, 1954, counsel for the accused asked for a month's continuance in order to obtain a deposition from Dr. Menninger. This motion was denied. Counsel then moved for an indefinite continuance for time to bring —if possible—Drs. Menninger, Kozal, or Overholser to Japan. This motion was also denied but a continuance was granted for one week to secure Japanese psychiatrists. The defense moved again

on March 22, 1954, for a continuance in order to obtain the presence of Dr. Overholser as a material witness; however, the defense could furnish nothing definite with respect to whether, if ever, Dr. Overholser would be available in Japan. An additional continuance for two days was granted. We note that the Japanese psychiatrists stated that in their opinion the accused was not responsible for his acts. That being so, and from all the facts we cannot find the rulings of the law officer to be as a matter of law reversible error. In any event, the determination as to whether the request for a continuance should or should not have been granted rested within the sound discretion of the law officer. Under the circumstances of this case we cannot say that he abused that discretion. See United States v Knudson, 4 USCMA 587, 16 CMR 161.

The accused also argues that he was prejudiced because use of the Department of Army Technical Manual, TM 8–240, Psychiatry in Military Law, by the court-martial and board of review, precluded their exercise of independent judgment. In this connection we announce that at most the ▆▆▆▆▆▆ "Tech Manual" occupies the position of a text book or treatise on the subject of insanity. (See opinion of Chief Judge Quinn, United States v Kunak, 5 USCMA 346, 17 CMR 346.) It is not competent evidence of either the facts or opinions advanced by the authorities. It may be used to a limited extent in connection with the testimony of an expert witness, but it does not have any independent probative value. A study of the record in this case now ▆▆▆▆▆▆ before us makes it abundantly clear that all the psychiatrists who testified at the trial arrived at their respective conclusions from an independent evaluation of many factors taken from numerous sources and the witnesses appeared to be completely unfettered by the "Tech Manual." As a matter of fact, there is no mention of this Manual throughout the trial. All of the psychiatric testimony for the Government was to the effect—without equivocation—that

424

the accused knew what he was doing at all times, could distinguish right from wrong and adhere to the right as to the offense charged. And at no place in the law officer's instruction did he advert to the "Tech Manual" or call the court's attention thereto.

During an out-of-court conference the accused requested the following instruction: "There is other evidence in this case which you may properly weigh with the evidence of voluntary intoxication in determining the accused's reasoning ability, such as the history of impulsive aggressive outbursts described by various witnesses before this court and the mental status of the accused as described by the expert witnesses." The accused assigns as error the refusal of the law officer to give this instruction on partial insanity as affecting premeditation. Although the law officer refused the requested instruction he gave instead, "In the light of all the evidence, if you have a reasonable doubt that the accused was mentally capable of entertaining the premeditated design to kill involved in the offense of premeditated murder you must find him not guilty of that offense." The law officer felt that this instruction adequately covered the effect of partial insanity on premeditation. During the out-of-court conference, he stated, "I am not going to give your proposed instruction . . . I believe my instruction is sufficient to cover all that without enumerating the evidence." In United States v Smith, 5 USCMA 314, 17 CMR ▪ 314, the trial court was given an almost identical instruction. This Court held, "This instruction adequately informed the court of the possibility of partial responsibility—and a consequent finding of unpremeditated murder. Thus, no error inheres in the *finding* of premeditated murder. Cf. United States v Kunak, supra." Also see United States v Higgins, 4 USCMA 143, 15 CMR 143. Moreover, the requested instruction in the instant case was somewhat similar to the instruction requested by the defense in United States v Dunnahoe, 6 USCMA 745, 21 CMR 67. As set out in that case, the perti-

nent portions of the requested instruction read:

"'There is other evidence in this case which you may properly weigh with or against the evidence of voluntary drunkenness in determining the accused's reasoning ability, such as the evidence of the accused's muscular coordination immediately before and immediately after the alleged offense, the accused's ability to speak coherently shortly after the offense, the accused's apparent lack of concern for himself shortly after the alleged offense, the accused's failure to conceal the body of the alleged victim, the accused's failure to obtain or conceal certain real evidence which tended to connect him with the alleged offense, the accused's statements to fellow soldiers made shortly after the alleged offense, and the accused's ability later to remember certain of the details surrounding the alleged offense.

"'If, in the light of all the evidence, you have a reasonable doubt that the accused was mentally capable of entertaining the premeditated design to kill involved in the offense of premeditated murder, you must find him not guilty of that offense.' "

This Court stated, after inspection of the quoted portions of the instruction (exclusive of the second paragraph, which was considered sufficient to meet the standards of partial insanity in Smith, supra, and Kunak, supra), that:

". . . The vice of the requested instruction is that it singles out bits of evidence and emphasizes them to the exclusion of others. An accused may not isolate particular facts of the case favorable to him and demand that the law officer give undue prominence to them. Neither may he, by suggesting some facts, require the law officer to summarize every fact for or against every issue. United States v Harris, 6 USCMA 736, 21 CMR 58."

It was precisely for this reason that the requested instruction was refused in the case now before the Court. When the requested instruction was proffered

**425**

by the defense, the trial counsel objected as follows:

"... I should like to suggest in reference to what counsel has offered that if there is to be any reference to specific evidence then all of the specific evidence which might be considered upon the issue should also be referred to and that in any event it should always be said in any instruction that this and all other evidence in the case touching upon these issues are what you should consider in arriving at your findings."

Likewise, here, the law officer—in line with the Court's reasoning, later reflected in Dunnahoe, supra—apparently concluded that the defense counsel was asking him to "single out bits of evidence and emphasize them to the exclusion of others," and feeling that he was going to give an instruction which would be sufficient as to the effect on premeditation of mental deficiency short of insanity, refused the instruction with the remark that, "I believe my instruction is sufficient to cover all that without enumerating the evidence." The better practice would have been for the law officer to have specified the circumstances bearing upon the problem here. But we are of the opinion that his failure so to do did not prejudice the accused. The law officer's instructions, taken as a whole, were adequate. In passing, we note that appellate defense counsel ■ complains of the definition of "irresistible impulse" given by the law officer at the trial. Portions of this instruction were discussed in an out-of-court hearing and certain modifications were made at the defense counsel's request. After the modifications, counsel for the accused voiced no additional objections to this part of the law officer's instruction. As given, the instructions on irresistible impulse follow the Manual.

The accused maintains that his rights have been prejudiced by the board of review by applying an appellate rule that "to justify a reversal circumstances must be such that the verdict shocks the conscience of the court." This, of

**426**

course, is not the proper test which should be applied by a fact-finding tribunal and if the board in fact applied such a test, it would be error. However the foregoing language was tacked on to another quotation by the board which had to do with conflicting psychiatric testimony. The entire quotation was taken from Holloway v United States, 148 F2d 665 (CA DC Cir) (1945), cert den 334 US 852 (1948), 92 L ed 1774, 68 S Ct 1507. The quoted portion applies to the Federal courts which have no fact-finding powers. But, the board of review here had fact-finding powers and therefore this language has no application to it. Article 66, Uniform Code of Military Justice, 50 USC § 653. Following the quotation from the Holloway case, supra, the board concluded its opinion, with the following terminal paragraph:

"Consequently, pursuant to our power under the Uniform Code of Military Justice, Article 66(c), and in accordance with the order of the United States Court of Military Appeals, the board has considered reports of Doctors Menninger and Overholser concerning the accused's sanity and evaluated them in conjunction with the evidence of record, together with the latest opinion of The Surgeon General of the Army and has independently arrived at the same conclusion as the members of the court-martial, and finds that the accused was at the time of the offense and at the time of trial and is presently beyond a reasonable doubt mentally responsible for his acts."

Clearly the board of review did not apply the quoted language to its finding for it is apparent from the board's own language that it concluded, after studying all the evidence, that the guilt of the accused had been established beyond a reasonable doubt.

We have reviewed the record of trial with care. The accused was represented by two attorneys, then in uniform, now in the civilian practice of law, who were competent trial lawyers, and they guarded the rights of their client with commendable force and vigor. The court-martial under proper

instructions on the law decided the issue of fact against the accused. The board of review with its fact-finding powers has also decided the issue against the accused. We find no errors of law which prejudiced the substantial rights of the accused.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

This is a most difficult case to decide objectively because we are faced with a beastly and senseless crime committed against a child of tender years. Nonetheless, the accused is one whose mental processes have, by any medical yardstick, been impaired. There is practically no dispute in the facts, for the killing is admitted, the accused's medical history is not controverted, and the evidence upon which the experts base their opinions is settled. The real dispute concerns the conclusion to be drawn from the medical evidence, for the expert witnesses are divided sharply on accused's mental condition and the issue of his responsibility for the offense. However, there are certain matters upon which they agree. Some five or more civilian psychiatrists and six or more military psychiatrists have participated in this case and they are unanimous in the conclusion that, regardless of the nature of accused's illness, he is dangerous to society, will remain so for many years, and should not be released from confinement unless there is clear and positive evidence of a major change for the better in his pathological and psychological processes. In addition, they agree that the accused suffers from some illness which may at times affect his mental processes. The military psychiatrists diagnose his condition as a character disorder, while most of the civilian experts arrive at the conclusion that he has psychotic episodes and that the killing probably occurred during one of those periods. Lastly, the experts agree that, regardless of how the illness is catalogued or characterized, it has

existed for some time and it is a part of accused's lifelong pattern of behavior.

It would serve no real purpose were I to set out the facts underlying the various conclusions reached by the experts. It is enough to say that those experts from the civilian community who testified or otherwise submitted their opinion are recognized as some of the outstanding psychiatrists in America, and they presented powerful reasons to justify their opinions that accused was insane at the time of the offense and not mentally responsible for the crime. On the other hand, military medical experts gave good reasons to support their unanimous conclusion that the accused, while suffering from a chronic, severe anti-social personality, with aggressive and sadistic trends, was sane at the time of the offense and legally responsible for its commission.

Our task would not be difficult if we were faced only with a dispute in the evidence or the inferences to be drawn therefrom, for if that were the gist of the controversy, we could solve the problem by merely saying that we do not have fact-finding powers, that two fact-finding agencies have resolved the issues against the accused, and that we are powerless to interfere. But we are faced with an instructional infirmity, and, in the light of the evidential posture of this case, I believe that deficiency is sufficient to undermine the findings of premeditated murder.

I agree that the law officer instructed the court-martial members that if, in the light of all evidence, they had a reasonable doubt the accused was mentally capable of entertaining the premeditated design to kill involved in the offense of premeditated murder, they must find him not guilty of that offense. Such language may be found within this cold record, but that is not the full story, for it was preceded by other instructions which must have had a tendency to becloud the issue and confuse the court members. Certainly, if that statement was fully and fairly understood by the court members to mean that accused's mental state, regardless of the diagnostic label, could

**427**

be considered in determining his mental capacity to premeditate, then I would concur with my associates. However, my perusal of the record forces me to conclude that the members of the court-martial were not told informatively how to consider a condition which, if the Government's witnesses were to be believed, might have prevented the accused from premeditating, but which would not, under their view, relieve the accused of criminal responsibility for the homicide. Very briefly, I will mention my reasons for that conclusion.

The instruction referred to in the Court's opinion is quoted as it appears in the record. It there appears on the page as a separate paragraph, but it was given immediately following an instruction on intoxication. The instruction on that subject deals with its effect on premeditation, but any reference to the effect which a mental condition less than insanity, such as a character or behavior disorder, as those conditions are defined in military publications, might have on that element are singularly missing. More to the point, the instructions on insanity, without some sort of additional explanation, would lead a court member to believe that the accused's mental condition could only be considered if it amounted to legal insanity, and then solely for the purpose of determining whether the accused was to be relieved of criminal responsibility for the principal offense and all included offenses.

In dealing with the issue of insanity, the law officer gave the usually accepted instructions previously found in military cases. He used the right and wrong test in conjunction with the irresistible impulse theory. In dealing with the ability to adhere to the right, he specifically informed the members of the court that before that hypothesis could be used, it was necessary that there be a total impairment of the ability to adhere to the right and that something less than that did not suffice to meet the standards of military law. In addition, he informed the court-martial members that an irresistible impulse must be an insane, irresistible impulse, that is, an irresistible impulse resulting from a disease of the mind as distinguished

from moral insanity, for he said that moral insanity, strictly speaking, is not insanity at all. Furthermore, he continued on to say that, for practical purposes, inability to adhere to the right occurs only in psychotics and that a mere defect of character, willpower, or behavior, as manifested by ungovernable passion or otherwise, does not necessarily indicate a lack of mental responsibility, even though it may demonstrate a diminution or impairment of the ability to adhere to the right. This is all very well when discussing the question of whether the accused is to be absolved of all criminal responsibility, but the thrust of those instructions is away from any theory that something less than psychosis can be considered by the court for any purpose. If the court-martial members understood the instruction in the manner in which I have interpreted it, then they would have to conclude that if the accused was psychotic he could be found not guilty, but that any impairment of the mental processes which did not reach that level of severity could not be considered at all. If such was the case, then the accused was prejudiced for, while the record would support a finding that he was legally sane, the medical evidence is also clearly sufficient to support a finding that his mental condition prevented him from premeditating the commission of this senseless crime. Surely this man was placed by the evidence in a category such that his illness must be considered in its relationship to both criminal responsibility and to the element of premeditation. The first was covered adequately by the instructions, the second not really at all.

In the recent case of United States v Dunnahoe, 6 USCMA 745, 21 CMR 67, I set out the reasons why I believed that well-recognized conditions which are characterized by some psychiatrists as character disorders and others as mental defects or derangements could be considered by court-martial members for the purpose of determining whether they affected the mental processes of an accused to such an extent that he could not premeditate. In that case I was not prepared to say—nor do I at this

time believe—that these disorders should be permitted to exculpate a person for the commission of a crime, but I have reached the conclusion that so long as the record shows a fair probability that the condition of an accused's mind is affected by some illness, even though he is not psychotic, the court-martial members should be instructed that they may consider it in ascertaining whether he actually could or did premeditate.

It may well be that my views on this particular issue will not become part of military law, but if a fair trial is to be assured when the life of an accused is at stake, it is necessary that law officers inform court members in clear and unmistakable language that they may consider any evidence in the record which casts light on the issue of premeditation, and that that evidence should not be excluded from consideration merely because medical experts disagree over its diagnostic label.

I would return the record to The Judge Advocate General of the Army for reference to a board of review, either to affirm a finding of guilty of unpremeditated murder and an appropriate sentence, or to grant a rehearing.