UNITED STATES, Appellee

v

THOMAS G. GRAY, Seaman, U. S. Coast Guard, Appellant

9 USCMA 208, 25 CMR 470

No. 10,176

Decided April 25, 1958

 

*Lieutenant Henry A. Cretella* argued the cause for Appellant, Accused.

*Lieutenant Commander Albert S. Frevola* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Commander Harley E. Dilcher.*

## Opinion of the Court

HOMER FERGUSON, Judge:

Security conditions at the United States Coast Guard Life Boat Station, East Moriches, New York, during the period from April to July 1956 left something to be desired. Of an approximate complement of seventeen men assigned to the Station, fourteen were actively engaged in a crime wave which included the larceny and subsequent sale of Coast Guard and private property. The accused was one of the more serious offenders in this latter group which stole such items as copper wire, gasoline, paint, oil, hub caps, a table radio, and a loud speaker from a nearby drive-in theater. A general court-martial convened by the Commander, Third Coast Guard District, found the accused guilty of seven specifications of larceny, three specifications of unlawful sale of military property of the United States, and a single specification of receiving stolen property, in violation of Articles 121, 108, and 134 of the Uniform Code of Military Justice, 10 USC §§ 921, 908, and 934, respectively. The convening authority set aside all specifications alleging unlawful sale of military property of the

United States because of an instructional error, but otherwise approved the findings and sentence.

Although the accused pleaded not guilty to all offenses charged, he elected not to defend on the merits but instead based his entire defense on the claim of insanity. Trial counsel presented sufficient evidence, including the accused's pretrial statement from which the court-martial could find the accused guilty beyond a reasonable doubt as to each offense. The defense evidence consisted entirely of the testimony of Dr. Deutsch, a psychiatrist with the United States Public Health Service, who had examined the accused over a period of several weeks prior to trial. At the conclusion of this examination, he prepared a written report which was approved by the Medical Director, Chief, Neurology and Psychiatry Service, United States Public Health Service, Department of Health, Education and Welfare. The report was admitted in evidence as a defense exhibit and contained the opinion that, although the accused knew at the time of these offenses that the acts he was committing

were wrong, his "ability to adhere to the right was markedly impaired." The report concluded with the following summation:

"7. Although the accused is capable of forming the degree of intent, wilfulness, malice, or premeditation called for by the nature of the offense charged, the patient has repeatedly stated that his particular type of behavior was not premeditated and that the decision to steal was in the majority of instances, something that was done on the spur of the moment, the result of some ill-defined impulse."

In contradistinction to this report, Dr. Deutsch testified at trial that the accused did not know that his acts were wrong. He explained that in his report he had used the word "wrong" as an "abstract concept" when he had said the accused knew at the time the offenses were committed "that the acts he was committing were wrong." Since that time, however, he had become familiar with the publication known as "Psychiatry in Military Law,"[1] and as a result of information contained therein he had changed his original opinion.[2] This was the only opinion contained in the report that he wished to modify. The publication was admitted in evidence as a defense exhibit.

On cross-examination, Dr. Deutsch qualified his opinion that the accused did not know his acts were wrong by adding that the accused did not feel the acts he committed were "particularly wrong." He also adhered to the opinion expressed in his report that the accused's ability to adhere to the right had "Not completely" been impaired. Extensive questioning elicited the following additional information: that the accused probably knew in general that what he was doing was wrong "but he felt that it was acceptable"; that he knew society frowned upon this sort of conduct but he "did not accept that fact"; that he knew what he did is considered wrong "but not necessarily by himself"; and that the accused had what might be termed a "flexible conscience," which means that a person might have "different morals and different moral standards with different people." When asked whether the accused could be characterized as suffering from a character and behavior disorder, he stated that to his way of thinking such disorder would constitute "mental illness." He asserted, however, that the accused was neither psychoneurotic nor psychotic. The final diagnosis offered was that the accused had a "schizoid personality" which is generally characterized by a person's inability to make meaningful relationships, self-preoccupation, and a susceptibility to daydreams and a life of fantasy as well as a tenuous personal connection in general with reality. Dr. Deutsch further advanced the opinion that an ideal disposition of the case would be to permit the accused to return to duty at a "very strict base" where he could eventually identify himself with those "who would set down a set of rules for him." He acknowledged that this might place a difficult burden upon the Coast Guard.

Five shipmates of the accused who had known him for periods ranging from several months to two years were next called as prosecution witnesses. Each testified that during these periods of acquaintance they had never observed anything abnormal or other-

---

[1] TM 8–240, AFM 160–42, Departments of the Army and the Air Force, May 1953.

[2] Paragraph 4 of the publication contains the following discussion:

"4. Knowledge that the Act was Wrong.

a. *Primary Test.* MCM, 1951, lays down as the primary test of mental responsibility the ability to distinguish right from wrong, and to adhere to the right, with respect to the act charged. The examiner must know two things about the word 'wrong,' as here used—

(1) *It is a concrete, not an abstract concept.*

(2) It implies that the community (the military, society generally) considers the act wrong. The appraisal of the act within the accused's own private ethical system is irrelevant. These are important elements in understanding the problem and should be clearly grasped by the examiner." [Emphasis partially supplied.]

**211**

wise unusual about his behavior. Evidence of satisfactory conduct and proficiency marks were also introduced. After being instructed, the court closed to deliberate on the findings and, upon reopening, announced that it had found the accused guilty of all offenses.

I

We granted the accused's petition for review to consider several issues raised. The major complaint is that the law officer erred in failing to instruct that a mental condition short of insanity may negate the existence of a specific intent to deprive the owner of his property with respect to the specifications alleging larceny, and receiving stolen property. The law officer had instructed the court-martial only on the issue of insanity and the question for our determination, therefore, is whether the evidence raised an issue of mental impairment short of legal insanity so as to require an appropriate instruction thereon. After carefully considering all the evidence adduced at trial, we must conclude that the issue was not raised and therefore no duty rested upon the law officer to so instruct. Considered in its entirety, the psychiatric testimony was simply to the effect that since stealing was so widespread where the accused was stationed, that his behavior was entirely in accord with the prevailing behavior at the base, and, therefore, he was unable to distinguish right from wrong. This accused had employed what amounted to no more than a private moral and ethical code to shape his conduct, even though fully aware this code was at variance with that of society in general. Cf. United States v Smith, 5 USCMA 314, 17 CMR 314. Furthermore, Dr. Deutsch, while testifying at trial, never altered his original conclusion contained in the written report that the accused was "capable of forming the degree of intent, wilfulness, malice, or premeditation called for by the nature of the offense charged." It is also significant to note that the psychiatrist never considered the accused's ability to adhere to the right as being impaired. In view of these circumstances we conclude that there was no duty upon the law officer to charge the court-martial on the limited issue.

II

The accused next contends that the law officer erred by referring to and quoting from the Departments of the Army and Air Force publication, "Psychiatry in Military Law," TM 8-240, AFM 160-42, in his instructions. The board of review considered this same issue and concluded that even if the law officer erred by quoting from the publication, it was not prejudicial because the instruction had been approved by this Court. In addition, they noted that the publication had been introduced in evidence as a defense exhibit and that the instructions given were not in conflict with the psychiatric testimony introduced by the defense. We agree with the result reached by the board of review.

In United States v Schick, 7 USCMA 419, 22 CMR 209, we discussed the use that may be made of the "Tech Manual." We said that at most it occupies the same position as any other "text book or treatise on the subject of insanity," and, as such, it is not competent evidence of either the facts or the opinions advanced by the authorities. While recognizing that it may be used to a limited extent in connection with the testimony of an expert witness, "it does not have any independent probative value." It may be used as any other treatise as an aid in framing instructions on a particular issue. Cf. United States v Rinehart, 8 USCMA 402, 24 CMR 212. United States v Gilbertson, 1 USCMA 465, 4 CMR 57. Law officers, however, in framing their instructions, should carefully avoid the indiscriminate use of lengthy passages contained in such treatises for otherwise error may well be predicated on the basis that objectionable or irrelevant matter was given to the court-martial for its consideration. Stated differently, a high degree of selectivity should dictate what portions of a treatise a law officer incorporates in his instructions. It should always be borne in mind that instructions are highly individualized legal aids which should be properly tailored to the par-

ticular facts so that they will present the issue as fully and accurately as possible.

It is also well to add that a law officer should refrain from informing the court-martial of the source from which a particular instruction has been obtained. Court members may be inclined to attach additional weight—which is wholly undeserving—to an instruction if they are told that such instruction has been framed from matter contained in an official service publication, such as the "Tech Manual." Cf. United States v Shaughnessy, 8 USCMA 416, 24 CMR 226. In a word, the source of the instruction is not a matter for the court-martial's concern or consideration, and the better practice would be for the law officer to exclude such information in his charge.

### III

The accused's remaining claim of error relates to a comment made by the law officer during trial. The alleged error arose in the following manner. During the examination of various prosecution witnesses, it soon became apparent that some of them had been involved in transactions which gave rise to the charges preferred against the accused. It also appeared that several of these witnesses were unaware of their rights concerning self-incrimination. Prior to the trial counsel's questioning of the witness, Eckhardt, the law officer advised him of his rights under Article 31 of the Code, supra, 10 USC § 831.[3] He then informed the witness that evidence had already been received "to the effect that you have received property which is known to have been stolen by the person charged." It is urged that this comment could be construed as indicating that the law officer had prejudged the question of the accused's guilt or innocence of the larceny offenses. While it is arguable that the comment amounted to no more than an inadvertent "slip of the tongue," which often-

times occurs in the best tried cases, we do not decide the issue on that basis.

It is, of course, well recognized that a law officer—just as his civilian counterpart the trial judge—in commenting upon the evidence, "must be cautious not to infringe on the accused's right to an impartial trial." United States v Andis, 2 USCMA 364, 8 CMR 164. The impact of such comments, however, must be measured against the "background of the attending circumstances and in the light of the entire record." United States v Jackson, 3 USCMA 646, 14 CMR 64. We have carefully considered the background of the instant case and are constrained to conclude that the accused could not have been prejudiced by the law officer's comment. Although the accused had pleaded not guilty to the offenses charged, the entire theory of defense rested solely on the issue of insanity. During trial, several stipulations joined in by the defense with the accused's consent were introduced in evidence which admitted all the operative facts pleaded except the element of criminality. In addition, the accused's voluntary confession was admitted without objection. We believe that any possible misconstruction of the law officer's remark was effectively dispelled by his subsequent instructions which clearly and forcefully advised the court members that "each of you must resolve the ultimate issue of the guilt or innocence of the accused in accordance with the law, the evidence admitted in court, and your own conscience." The law officer concluded with the admonition that the court "must disregard any comment or statement made by me during the course of the trial which may seem to indicate an opinion as to the guilt or innocence of the accused, for you alone have the independent responsibility of deciding this issue." When viewed in the light of these circumstances, the error complained of was rendered harmless. Article 59(a) of the Code, supra, 10 USC § 859.

3. Paragraph 150b, Manual for Courts-Martial, United States, 1951, contains the provision that the law officer "should advise an apparently uninformed witness of his right to decline to make any answer which might tend to incriminate him." Cf. United States v Howard, 5 USCMA 186, 17 CMR 186.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge LATIMER concur.