UNITED STATES, Appellee

v

LACY JONES ALLEN, Captain, U. S. Marine
Corps, Appellant

11 USCMA 539, 29 CMR 355

No. 13,905

Decided June 17, 1960

*Lieutenant Colonel E. W. Johnson,* USMC, argued the cause for Appellant, Accused.

*Major George M. Lilly,* USMCR, argued the cause for Appellee, United States.

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused was found guilty of larceny, in violation of Uniform Code of Military Justice, Article 121, 10 USC § 921. He was sentenced to dismissal from the service. Intermediate appellate authorities affirmed, and The Judge Advocate General of the Navy certified to this Court the following issues:

"(a) 'Did the repeated reference by trial counsel to the "policeman at the elbow test" and his use of the technical manual, TM 8–240 prejudice the rights of the accused?;

"(b) 'Was the accused prejudiced by the argument made by trial counsel?;

"(c) 'Was the accused prejudiced by the instruction of the law officer on the sentence?' "

The evidence adduced at the trial

tends to establish that the accused removed certain Government-owned machine tools under his control from the Marine Corps Air Station, Beaufort, South Carolina, and sold them to a civilian firm in Waycross, Georgia. The tools were subsequently identified as Government property and recovered.

Several lay witnesses testified for the defense. Uniformly, they established a close acquaintance with the accused for a number of years and declared that they had noted a considerable change in his attitude and behavior at approximately the time of offense. Following the receipt of their testimony, Dr. Boris Astrachan, a qualified psychiatrist, testified that he had extensively examined the accused and was of the view that, at the time of the offense, the latter was suffering from a mental disease which caused him to be unable to adhere to the right. He admitted he had initially diagnosed accused's condition as a neurotic depressive reaction. However, on being informed of Captain Allen's intent on one occasion to mutilate himself, he eventually concluded the accused was suffering, at the time of the theft, from a psychotic depressive reaction.

On cross-examination, the trial counsel repeatedly made reference to whether the accused would have committed the offense in question "if there had been a policeman or MP standing next to him when he took this gear." He then referred to the now familiar Technical Manual entitled "Psychiatry in Military Law," and ascertained that Dr. Astrachan was aware of its contents. Over objection by defense counsel, trial counsel read various paragraphs from the Technical Manual to Dr. Astrachan, asking whether he agreed with the material thus set forth. In each instance, Dr. Astrachan expressed agreement generally with the psychiatric concepts therein presented but refused to comment on the "legal matter" contained in some of the paragraphs read. On redirect examination, Dr. Astrachan testified that he did not "feel particularly bound by this pamphlet."

In rebuttal, the trial counsel adduced the testimony of Dr. Loren L. Royal, also a qualified psychiatrist. Dr. Royal testified that he was of the opinion that the accused, at the time of the offense, was able to distinguish between right and wrong and to adhere to the right. His ability to adhere to the right, however, was impaired, as the accused was suffering from a depressive reaction of neurotic proportions. Dr. Royal's attention was also drawn to the "policeman at the elbow" test, and he testified that he understood it to mean an inquiry into whether accused would have committed the offense if apprehension or detection was imminent or immediate. The difference of opinion between Dr. Astrachan and Dr. Royal was denominated as one of degree. Dr. Royal concluded his testimony on direct examination with the declaration that his opinion was based upon his view "of the way that military law and psychiatry must work together."

In his final argument, trial counsel made the following statements:

". . . Now what is this adhere to the right business? What does it mean? It really means that at the time and place where he took the gear the accused could not have done otherwise. If he could have done otherwise then you cannot say that he could not adhere to the right. Not being able to adhere to the right is in effect a form of compulsion. Now the law officer is not going to use the term irrestible [sic] impulse in his instructions and yet he is going to tell you that if you feel that the accused would not have so acted, if he could have expected to immediately be apprehended then this is not a true inability to adhere to the right. *Doctor Astrachan chose to or not rather to be bound by the technical manual which I questioned him on, entitled Psychiatry and the Law, whereas Doctor Royal adhered very closely to it. Now here is the reason for the difference of opinion. Doctor Royal brought out on the witness stand, in all States, there is a test for legal insanity. In Washington, D. C. and one or two other states there is a different test. It is called the Durham test based on the Durham decision which was handed down*

540

by a court in Washington. The military also has its test. Now it doesn't do any good for a military psychiatrist to come in and say, well under the test laid down by the state of New York, the accused is sane, and on the test laid down by the District of Columbia, he could not adhere to the right. *The only thing WE ARE concerned with is, could he or could he not adhere to the right under the test laid down by the military.* The court will receive that test and the instructions governing it from the law officer. And I submit that you all are bound by this instruction. . . . Members of the Court, the accused is a Captain in the Marine Corps, and I certainly don't enjoy speaking of him like this, however, *it seems very strange to me that there is nothing brought out, nothing appeared to be wrong with this man until after he talked to his Defense Counsels [sic]. Nothing appeared to have been wrong with him until it was obvious that he was hooked when he made that statement. The presecution's [sic] case was air tight. There were no objections made. There was no way the defense could keep my evidence from coming out. The only other alternative was an insanity plea, and that is what they did. Doctor Astrachan refusing to go along with the military manual, Psychiatry and the Law, played right into their hands.* This again is good experience for him, and I am sure that he enjoyed coming over here and testifying. . . . Now once again, the only reason Doctor Astrachan said this man has a psychosis is because when he came back from Bethesda, he said Doctor, on one occasion I thought about . . . [self-mutilation]. This does seem odd—if we believe it, if we accept it. Doctor Royal was very suspicious of it because as I pointed out, this should have come up long ago. *Now realize this man's position when he returned from Bethesda. An intelligent officer, no dispute, he's intelligent, he has been up there, he knows that he is under a charge of larceny, he has been told up there that the Doctors feel that he could adhere to the right, what does he do? He comes*

back here with something new, and Doctor Astrachan says, hmm — I don't know whether any of the court members have read Anatomy of a Murder, but in there, there was an interesting portion of the book dealing with a similar situation. There was an air tight case against the accused and the lawyer knew his only defense would be insanity. So he sat down and gave what he called 'the lecture' to his client. I'm not saying this happened in this case, but I'm saying that such things are possible. A shrewd defense counsel after talking to the accused can say, well, that's fine, it's too bad you hadn't gone a little further and perhaps contemplated . . . [self-mutilation]. *The next day or the day after that, sure enough, the accused. will come in and he'll say, you know I forget [sic] to tell you something. On one occasion I contemplated . . .* [self-mutilation], *and the defense counsel said, wonderful, fine, I'm glad you remembered to bring it out. Those things do happen.* . . . Members of the Court, the Law Officer is going to instruct you at great length on insanity. One of the things that he is going to tell you, is very important. This will be the law. *This is the law by which the court is bound. This is the law by which the military psychiatrist are bound. This is the law by which Doctor Astrachan should have been bound, in giving his testimony. If the accused would not have committed the act if the circumstances were such that he could have expected immediate detection and certain apprehension he can not be said to have acted under an inability to adhere to the right.* That is what the Law Officer will instruct you. That is what Doctor Royal said, and very reluctantly that is what Doctor Astrachan said too. That is the policeman at the elbow test, which you have heard talked about, and the Law Officer will cover it. Gentlemen, I submit that the two expert witnesses were in agreement up to a point. It is only when they begin to interpret the law with their psychiatric findings that they differ. *I submit the reason is*

**541**

*because they were using different reference material, different manuals. Doctor Royal was using psychiatry and the law which embodies the policeman at the elbow test, as the Law Officer is going to incorporate into his instructions, which the court is bound by. Doctor Astrachan did not feel bound by that. Doctor Astrachan perhaps was thinking of the Durham law, or some other law of which we cannot take notice.*" [Emphasis supplied.]

The law officer fully instructed the members of the court-martial on the elements of the offense and the issues of mental responsibility and mental capacity to entertain the specific intent involved in larceny. He gave no instructions, however, concerning the trial counsel's argument that the Technical Manual represented the official view concerning the correlation between psychiatric doctrines and the law of mental responsibility.

## I

The first certified question involves the use by the trial counsel both of the "policeman at the elbow" test and the Technical Manual. We need not concern ourselves with the use of the test, see United States v Covert, 6 USCMA 48, 19 CMR 174, for we are convinced that the inquiry of The Judge Advocate General must be answered in the affirmative because of the references to the Technical Manual.

In United States v Gray, 9 USCMA 208, 25 CMR 470, we pointed out that Technical Manual 8–240, ██ promulgated by the Army ██ and adopted by the Air Force and Navy as an "official" publication, occupies no better position before a court-martial than any other text or treatise on the subject of insanity. In that case, at page 212, we stated that it may be used only "to a limited extent in connection with the testimony of an expert witness." See also United States v Schick, 7 USCMA 419, 22 CMR 209. We decry in this record an attempt by the Government to transcend the boundaries we thus marked out, for, both in his cross-examination of Doctor Astrachan

542

and his argument, the trial counsel sought to impress upon the members of the court-martial that the accused's defense of insanity lacked merit solely because it did not fall within the principles "officially" espoused in the publication. The attempt thus made to circumscribe the deliberations of the court-martial must be unhesitatingly condemned, for, as the Chief Judge said in United States v Dunnahoe, 6 USCMA 745, 21 CMR 67, at page 761:

"... [T]he military law on the the legal effect of a particular mental condition of the accused cannot be determined by the classification of mental disorders in service publications."

We reiterate our holding in United States v Gray, supra, that technical manuals promulgated by the armed services play no role in judicial proceedings beyond that accorded ordinary texts. When they are improperly used by the Government in an attempt to control consideration by the court of a particular defense advanced by the accused, intimations of command control are introduced and, absent proper curative action by the law officer, reversal must follow. The circumstances in this record depict just that situation, for the trial counsel repeatedly adverted to the Technical Manual, its "official" character, and the purported failure of Dr. Astrachan to abide by its terms. The evidence before the court-martial raised an issue concerning accused's responsibility for the offense with which he was charged, and the effect of the prosecution's declamation on the stature of the Technical Manual is apparent. Accordingly, it is clear beyond cavil that the Government's use of the publication was prejudicial to the substantial rights of the accused.

## II

The second certified issue concerns itself with whether accused was prejudiced by the trial counsel's ██ argument. Much of what has been stated above concerning the Technical Manual is equally applicable here, for it was principally in his argument that the trial counsel transcended the boundaries which we

set forth in United States v Gray, supra. Nevertheless, one further matter in the Government's closing statement merits our attention. In attempting to explain away Doctor Astrachan's testimony, he referred to a recent work of fiction which, in part, purported to depict the manner in which some attorneys encourage their clients to testify falsely in order that an appropriate defense may be fabricated. Whatever the literary merit of the work involved, such tactics have no part in the practice of law. If the trial counsel's accusation was based upon fact, it was his duty to bring evidence of the "lecture" before the court-martial. His failure to adduce such proof leaves us no alternative but to conclude that his insinuations were completely without foundation. We have pointed out heretofore that the prosecution is entitled in argument to strike hard blows, but they must also be fair. United States v Doctor, 7 USCMA 126, 21 CMR 252; Berger v United States, 295 US 78, 79 L ed 1314, 55 S Ct 629 (1935). One can hardly conceive of a method more calculated to deceive the court concerning an apparently valid defense than baselessly to suggest that it was falsely constructed by a "shrewd" defense counsel. Coming as it does from the Government's representative, it unjustifiably invited the court members to give short shrift to the accused's contention that he was irresponsible. Under the circumstances, and particularly in the light of trial counsel's repeated references to the "official" nature of the matters set forth in the Technical Manual, we are certain that the argument as a whole prejudiced the substantial rights of the accused. United States v Valencia, 1 USCMA 415, 4 CMR 7.

### III

The last certified question presents the issue of whether the law officer erred prejudicially in advising the members of the court-martial that accused could not be sentenced to confinement at hard labor or forfeiture of all pay and allowances unless he was also dismissed from the service. As a rehearing is required by our answers to the other certified questions, this inquiry is rendered moot. Moreover, we are certain that the error involved in the instruction will not be repeated in the event the accused is again found guilty. United States v Smith, 10 USCMA 153, 27 CMR 227; United States v Varnadore, 9 USCMA 471, 26 CMR 251. There is no need, therefore, for us uselessly to express our views at this time.

The first two certified questions are answered in the affirmative. The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Navy. A rehearing may be ordered.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

It appears as though my associates are reversing this case largely for the reason that a publication on psychiatry used in a limited way by trial counsel bears the Army and Air Force authentication. Merely because a pamphlet is prepared, published, and distributed by the services and carries a Technical Manual designation does not make it bad or inaccurate. Neither does it justify the charge that it is a form of command control; nor is the mention of its name by trial counsel error *per se.* The pamphlet is nothing more than a short dissertation on the principles of psychiatry as framed by military law and printed in such a manner as to aid military doctors and permit ease in distribution. Significantly, if I were to delete the name on the cover and substitute a copy of "Psychiatry and the Law" by Guttmacher and Weihofen or "Psychiatry and the Law" by Hoch and Zubin in place of the service pamphlet, I would find the same principles of psychiatry being expounded. If it was necessary to surmise, I would conclude that much of the information contained in the military publication is based on the views of recognized civilian psychiatrists who are used by the services for consultation purposes. Except as to the legal test for insanity, the doctrine in the Technical Manual and principles found in standard works are in

**543**

accord, although in certain areas the experts do not always agree. However, if the law on insanity in the military happens to be different from civilian law, that is unimportant, for the former is as set out in the Manual for Courts-Martial, United States, 1951, and approved by this Court and is not made by either military or civilian doctors. In that connection, it is of some importance to note that in the principal opinion the Court does not suggest that the publication contains any doctrine not recognized by medical authorities.

Initially, I must disagree with my associates' pronouncement that trial counsel sought to transcend the boundaries of usability this Court has marked out for the Technical Manual. I state unequivocally that this Court has not set limits on the right to use the Technical Manual for purposes of cross-examination but has led the working people in the field to believe to the contrary, for we have said it is in the same category as any textbook on insanity and that it may be used in connection with the testimony of an expert witness. To support that statement, I quote from Judge Ferguson's opinion in United States v Gray, 9 USCMA 208, 25 CMR 470, which at the time of publication reflected the views of a unanimous Court:

"In United States v Schick, 7 USCMA 419, 22 CMR 209, we discussed the use that may be made of the 'Tech Manual.' We said that at most it occupies the same position as any other 'text book or treatise on the subject of insanity,' and as such, it is not competent evidence of either the facts or the opinions advanced by the authorities. While recognizing that it may be used to a limited extent in connection with the testimony of an expert witness, 'it does not have any independent probative value.' It may be used as any other treatise as an aid in framing instructions on a particular issue. Cf. United States v Rinehart, 8 USCMA 402, 24 CMR 212. United States v Gilbertson, 1 USCMA 465, 4 CMR 57."

If from that language trial counsel was mistaken in concluding that he was

well within his rights to use the pamphlet for cross-examining purposes, then he is in the company of this dissenting Judge. As I read the opinion, the Technical Manual may be used in a limited way in connection with the testimony of an expert witness and that is the manner in which it was used.

The second facet of this dispute involves the contention that trial counsel erred when in cross-examination he made mention of the "policeman at the elbow" test. He combined his cross-examination about that test with the fear of detection and apprehension yardstick, and both have been recognized by us. In United States v Smith, 5 USCMA 314, 17 CMR 314, a majority of the Court expounded this view.

"It may then be asked whether this Court views as correct the test stated in the 1950 edition, or that found in the 1953 version, of TM 8–240. In the only important sense we deem each to be correct since, although differing somewhat in wording, they possess an identical core of meaning. That meaning simply has to do with whether the prospect of penal sanctions would have deterred the accused from the conduct in question—in short, whether punishment had significance for him as to that act. This is made clear in paragraph 5c of the 1950 Technical Manual, which states in explanation of the 'policeman' test that 'No impulse that can be resisted in the presence of a high risk of detection or apprehension is really very "irresistible." ' Unfortunately the wording of paragraph 5a of that same document with respect to the 'policeman' test might, if taken alone, be construed in a slightly different manner—a circumstance which doubtless produced the clearer phraseology of the later edition of the Technical Manual.

The test is not without support by civilian experts, for in "Psychiatry and the Law" by Hoch and Zubin, 1955, at pages 63 and 64, I find the following statement:

"Some psychiatrists like the old 'policeman-at-the-elbow-test.' This formula would ask the expert one

question: 'Would this man have committed the act had there been a policeman at his elbow?' It is a concrete way of asking whether the defendant would have been influenced by the certainty of identification. This rough and ready rule corresponds to the popular concept of a good criterion. If mental illness so influences a person that he commits a crime in the presence of a policeman, it must be assumed either that he was hopelessly in the grip of an uncontrollable impulse or that he felt that his act would accomplish so vast a public benefit that no one would blame him for it. Either way, there is a good common-sense case made out for acquitting the defendant. This is not a difficult test to apply. The psychiatrists can usually form a pretty shrewd opinion about whether the accused would have proceeded with his act even in the presence of a policeman. It would furnish no umbrella to the psychopath, because the psychopath usually has too good a sense of timing to commit a serious crime in the presence of a policeman. It would protect the paranoiac who commits a crime to achieve a great public benefit, or to make himself a martyr. It would also protect the schizophrenic who mows down people in wild catatonic excitement. This formula disposes of irresistible impulse because an impulse that can be resisted in the presence of a policeman is obviously not irresistible."

Also, in "Psychiatry and the Law" by Guttmacher and Weihofen, 1952, I find authors friendly to the military treatment of insanity who seem to recognize the "policeman at the elbow" concept. I set out two separate quotations from those authorities, the first which expresses a view on the military consideration of mental illness and the second their conclusion of the test. At page 413 I find the following view:

"Although we might expect the armed forces to employ in court-martial a more summary procedure than do the civil courts, the fact is that both the Army and the Navy today employ a level of scientific jurisprudence which the civilian courts have not yet attained. In the Navy, the Judge Advocate General seeks medical counsel from the Bureau of Medicine and Surgery before handing down legal opinions in cases involving behavior problems. The Legal Medicine Branch acts only in an advisory capacity, but has been given the widest latitude in appraising problems of culpability. The Army during World War II had a bulletin prepared dealing with psychiatric testimony before courts-martial. The irresistible impulse was included in deciding whether the defendant was insane at the time of the act charged."

The second quotation is found at page 410 and it sets out this formula:

"The term 'irresistible impulse' is not a very good one. *Irresistible* implies that the person was absolutely unable to resist; *impulse* suggests an urge that is sudden and overwhelming but momentary. Such conditions exist—for example, in the irrational acts of confused epileptics, paretics, and schizophrenics—but they are rare. More common are urges which are not wholly irresistible, and which are not of sudden overwhelming force. Most exhibitionists, for example, have enough control not to yield to their impulse in the presence of a policeman."

Moreover, it is to be noted that the defense medical expert agreed with the fear and detection principle, and with the foregoing authorities as a base to support the test, I am at a loss to understand why reference by trial counsel to the formula could be error. But more important, I fail to understand why my associates fail to give consideration to the rights of counsel who is cross-examining. Surely he has some latitude in seeking to discover any weakness in the foundation supporting the expert's conclusion. A medical expert was on the stand, and trial counsel was seeking to test the base of his opinion. The doctor's experience in psychiatry consisted of one year in residency and one year of practice prior to trial. He was relying on medical authorities to support his views and so

545

far as I understand the law, it is a permissible practice to use a textbook or treatise for the purpose of testing the validity of his conclusions. The same questions could have been asked had trial counsel been using the authorities I quote above, and any other for that matter. Certainly, if we meant what we said in United States v Gray, supra, and if the Technical Manual occupies the same position as any other text, it can be used to fortify or weaken the conclusions of the expert.

In connection with this same subject, it is said in the majority opinion that the Technical Manual was used over the objection of defense counsel. I read the record quite differently for, when the document was first mentioned, defense counsel requested that it be admitted in evidence. The law officer disagreed, and properly so. This ruling was prior to the questions which took the form of asking the psychiatrist whether he agreed or disagreed with stated principles of insanity which were incorporated in the particular question. The doctor agreed with some of the concepts, disagreed with others and demurred to a few which he claimed were expressed poorly. It was only after some half a dozen questions had been asked and answered that defense counsel made the following statement:

"I'm going to propose an objection to this whole line, I guess you would call it questioning. I don't know if the trial counsel is trying to draw some credit from the testimony of the Doctor, but it seems right now to be giving a lecture on irresistible impulse. I don't think the trial counsel is an expert. To my knowledge, Doctor Astrachan has not referred to the law of irresistible impulse in his argument. I would like you to, Mr. Law Officer, to instruct the trial counsel to stick to, as best he can to the testimony that was elicited upon the direct examination and go into irresistible impulse on his own time."

If that is a valid objection, it is no more than an assertion that trial counsel is exceeding the scope of the direct examination. It was overruled, and correctly so, but I fail to see how that objection suggested to the law officer

546

that defense counsel who had sought to have the Technical Manual introduced in evidence was objecting to its being used to test the conclusion of the expert.

That brings me to my next ground of dissent. If, as my brothers say, this publication was a sort of command control, the expert witness for the defense did not seem to so understand. Neither did the trial counsel, defense counsel, nor the law officer. If the doctor was brainwashed, I misread his testimony, for on redirect examination by defense counsel, the following question was asked of him and the recorded answer was given:

"Q. Do you feel particularly bound by this pamphlet, Psychiatry in Military Law, do psychiatrists particularly feel bound by it, in other words, is this a bible?
"A. No."

Furthermore, he was not at all hesitant in supporting or taking issue with the principles enunciated, and there was not the slightest attempt to bind him to the concepts stated.

The expert for the Government was not asked whether he was influenced by the Technical Manual, but it is crystal clear he made his diagnosis from his personal interview and examination of the accused, together with all information furnished by the patient. Moreover, the statement that "trial counsel repeatedly adverted to the Technical Manual, its 'official' character, and the the purported failure of Dr. Astrachan to abide by its terms" is not supported by the record. Prior to argument, he mentioned the document once in his cross-examination of the defense expert, and that was for the purpose of identifying the source of the psychiatric principles he incorporated into the questions he propounded to the doctor. Also, in his examination of the psychiatrist who testified for the Government, he inquired whether that expert was familiar with the pamphlet. In his summation, when speaking of the different conclusions of the two doctors, he said this:

". . . I submit the reason is because they were using different ref-

erence material, different manuals. Doctor Royal was using psychiatry and the law which embodies the policeman at the elbow test, as the Law Officer is going to incorporate into his instructions, which the court is bound by."

I must also part with my associates on their holding that the arguments of trial counsel require reversal. In United States v Sims, 5 USCMA 115, 17 CMR 115, the Chief Judge, speaking for a unanimous Court, stated:

"For his second claim of error, the accused argues that trial counsel's remarks on the accused's silence at the time of the search were improper and prejudicial. The Government calls attention to the accused's failure to object to any of these comments, and urges application of the principle of waiver. Ordinarily, a failure to object to improper comment by the prosecuting attorney would preclude raising the issue on appeal. Mitchell v United States, 208 F2d 854, (CA8th Cir 1954), cert den 347 US 1012, 98 L ed 1135, 74 S Ct 863; Langford v United States, 178 F2d 48, (CA9th Cir 1949), cert den 339 US 938, 94 L ed 1355, 70 S Ct 669. In a number of cases which were before us on mandatory review, we considered this claim of error, even though no objection had been made at the trial. United States v Ransom, 4 USCMA 195, 15 CMR 195; United States v Lee, 4 USCMA 571, 16 CMR 145. The nature of those cases made it appropriate to give appellate consideration to the allegation. But, we are not disposed to entertain such claims indiscriminately, when no effort has been made to curb the allegedly improper conduct, and to obtain a ruling from the law officer designed to eradicate the possibility of harm resulting from trial counsel's improprieties. See United States v O'Briski, 2 USCMA 361, 8 CMR 161. However, since the accused strenuously argues that 'trial counsel's questionable success in eking out a conviction was attributable solely to his closing argument,' we think the interests of justice will best be served if we consider the claim upon the merits."

In the case at bar the entire argument made by trial counsel did not draw even a single objection from defense counsel. And parenthetically I might note that his conduct of accused's defense was excellent, including his answering argument to trial counsel's remarks. But more to the point, my previous discussion should indicate that trial counsel's reference to the policeman at the elbow test was not improper and, while presenting his argument on that aspect of the case, he was careful enough to inform the court members that the law officer would instruct them on the law. Defense counsel in his argument reiterated what trial counsel had said about the law officer being the source from which they would gather the law and informed the members that neither they nor the witnesses were bound by the Technical Manual. Court members are presumed to follow the law as given by the law officer and he, as both counsel had suggested, gave them the proper formulae without reference to the Technical Manual or the policeman at the elbow test.

Moreover, I answer the argument that when trial counsel mentioned the book *Anatomy of a Murder*, he committed reversible error. He expressed very clearly that he was presenting his argument in the form of a similitude. He then went on to show why the facts of this case could be compared with the hypothetical situation found in the above-mentioned book. When it is considered that the accused did not consult a psychiatrist for some six months after the larceny; that his counsel sent him to Dr. Astrachan; that he was interviewed by the doctor on some six to nine occasions; that he bared his whole life to the doctor, including a contemplated suicide and his submission to a vasectomy; that the doctor found no evidence of insanity; thereafter, that the accused was sent to the Naval Hospital in Bethesda, Maryland, where he again related the important incidents of his life; that again his condition was diagnosed as not being a mental disease, defect, or derangement; that Dr. Astrachan first informed the trial counsel that accused was sane; that subsequent to all the foregoing the doctor

changed his diagnosis shortly before trial because, according to him, for the first time the accused mentioned that he, accused, contemplated shooting off his penis; that the doctor "would like to see . . . [the accused] acquitted"; and that there is not a grain of evidence to support the mutilating idea, I believe trial counsel was drawing an inference which could be supported by the record. Obviously, he could not prove where the idea originated, but he had overwhelming evidence that the suggestion of self-mutilation came late in the day, was uncorroborated, and was an afterthought. Trial counsel did not state categorically that the defense was the figment of someone's imagination, and he asserted that, "I'm not saying this happened in this case, but I'm saying that such things are possible." It should go without saying that the experiences of lawyers and judges bear out the accuracy of his statement that such things are possible.

While trial counsel has a duty to strike only fair blows, he should not be muzzled to a point where he cannot be an advocate for the Government and draw inferences favorable to the prosecution. He need not extol the virtues of the defense, and he can argue the strongest showing for his side of the controversy. Because I believe the following to be a moderate statement on a prosecutor's latitude in final arguments, I quote and subscribe to the concept expressed in Judge Learned Hand's opinion in Di Carlo v United States, 6 F2d 364 (CA2d Cir) (1925):

". . . While, of course, we recognize that the prosecution is by custom more rigidly limited than the defense, we must decline to assimilate its position to that of either judge or jury, or to confine a prosecuting attorney to an impartial statement of the evidence. He is an advocate, and it is entirely proper for him as earnestly as he can to persuade the jury of the truth of his side, of which he ought to be thoroughly convinced before he begins at all. To shear him of all oratorical emphasis, while leaving wide latitude to the defense, is to load the scales of justice; it is to deny what has always been an accepted incident of jury trials, except in those jurisdictions where any serious execution of the criminal law has yielded to a ghostly phantom of the innocent man falsely convicted."

Finally, with respect to the last certified issue, I point out that accused was sentenced only to dismissal. No confinement, forfeitures, or other accessory punishments were included. Manifestly, then, under the case the majority cite there is no reasonable possibility that the instruction mentioned by my associates influenced the court-martial on the sentence imposed. United States v Smith, 10 USCMA 153, 27 CMR 227. Furthermore, there need be no fear that the instructional error will creep in upon a rehearing, for under the law the permissible punishment may not exceed the prior sentence to dismissal.

For the foregoing reasons I would affirm the decision of the board of review.