UNITED STATES, Appellee

v

HOWARD W. JENSEN, Colonel, U. S. Air Force, Appellant

14 USCMA 353, 34 CMR 133

No. 16,987

January 17, 1964

*Major William A. Crawford, Jr.,* argued the cause for Appellant, Accused. With him on the brief was *Colonel Daniel E. Henderson, Jr.*

*Major James Taylor, Jr.,* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

## Opinion of the Court

FERGUSON, Judge:

Tried by general court-martial, the accused was found guilty of thirteen specifications of making and uttering bad checks, with intent to defraud, and a single count of dishonorable failure to pay a debt, in violation, respectively, of Uniform Code of Military Justice, Articles 123a and 133, 10 USC §§ 923a, 933. He was sentenced to be dismissed from the service. The convening authority set aside the findings of guilty of dishonorable failure to pay a debt but otherwise approved the proceedings and sentence. The board of review affirmed, and we granted accused's petition for review upon the issue:

"THE ACCUSED WAS PREJUDICED BECAUSE THE TESTIMONIAL FREEDOM OF THE GOVERNMENT'S PSYCHIATRISTS WAS IMPROPERLY CIRCUMSCRIBED BY THE PROVISIONS OF AFM 160–42."

The evidence indicates that accused, a senior officer occupying a responsible position and with otherwise impeccable

moral standards, indulged in gambling sprees at casinos in Reno, Nevada. He financed his venture by knowingly writing the worthless checks in question prior to embarking upon this ill-fated course of conduct. He had so indulged himself periodically in the past; had, as now, suffered heavy losses; and had always managed to pay off the debts thus incurred. On this occasion, he was apparently unable immediately to do so and voluntarily made a clean breast of the affair to his superior officers.

The defense tacitly conceded the foregoing to be the facts, but urged the court-martial to acquit accused upon the basis of lack of mental responsibility. In support of its contention, it adduced testimony from several psychiatrists that accused, while able to distinguish right from wrong, was with respect to the offenses charged, unable to adhere to the right. Each declared Colonel Jensen was mentally ill, having for years suffered from a severe obsessive, compulsive reaction. Because of the anxiety caused by the disease, he would periodically and compulsively engage in gambling. During these episodes, according to Dr. Peal, gambling "became as important to him . . . as some of the more · basic instincts such as breathing. He could no more control the gambling than he could his breathing at the time and the reason that it's so important is because of what the gambling and the money mean to him psychologically and this meaning he has never been too much aware of. This is part and parcel of his illness." He could not adhere to the right with respect to writing the worthless checks, as this "was really a part of the impulse to gamble and he only did this in connection with the gambling." He "had no control over his ability to obtain money for gambling."

In rebuttal, trial counsel called witnesses whose evidence tended to establish that accused was mentally responsible for the offenses with which he was charged. The experts who appeared for the Government agreed that Colonel Jensen was mentally ill and suffered from an obsessive, compulsive reaction. They were, however, of the view that

his ability to adhere to the right was only impaired as opposed to being completely eliminated. It is in their testimony that references were made to use of the now familiar Air Force Manual 160–42, Psychiatry and Military Law.

Thus, Captain Siegal, a duly qualified psychiatrist, in testifying that the accused, in his opinion, was able to adhere to the right, declared:

"This was one of the questions I was required to answer and I believe that certain rules were set down before me concerning answering this question. These rules had to do with whether or not my patient, Colonel Jensen, was so far free of mental defect and derangement that he was —the question had to do with whether or not he was completely impaired as to his ability to adhere to the right, and this was somewhat restrictive to me. And, since I was required to answer the question as explained in the manual and this had to do with whether or not he would have committed the acts had he run the risk of immediate apprehension, in taking this into account, in other words, the concept of immediate apprehension and equating this with complete inability to adhere to the right, my opinion in this respect was that his ability to adhere to the right was not completely impaired but he would not have committed these acts had he run the risk of immediate apprehension. If someone had been standing over him ready to apprehend him at the time, I don't feel he would have committed these acts. On the other hand, I must say that I do feel at these times his ability to adhere to the right was definitely impaired."

On cross-examination, he was interrogated further concerning the test he "had to apply," and stated he considered it to be, psychiatrically, "somewhat limiting," and went on to state:

". . . In other words if I am required to answer this question just with a straight 'yes' or 'no' answer, *according to these rules laid down before me, I feel very restricted in giving a psychiatric evaluation of the*

*mental responsibility of any patient."* [Emphasis supplied.]

Captain Norman L. Carden also testified to the accused's mental responsibility. Dr. Carden, likewise appearing for the prosecution, stated that, "within the confines of the stipulations of the military, as set forth in Paragraph 5, of 160–42, that he could adhere to the right, although this ability to adhere appeared to us to be impaired." His determination was made on the basis of the patient's history, symptoms, and dynamics as presented by Dr. Siegal; his own interview and clinical impression of Colonel Jensen; and "thirdly by virtue of the questions asked on the sanity board and specifically using the Manual AFR [sic]160–42, Paragraph 5, that specifically makes a statement that in order to determine the ability of an individual to adhere to the right, one must ask three sub-questions. And, among those questions is the statement that one must ask one's self if the individual were going to be almost immediately apprehended by legal authorities, would he have committed the alleged criminal act."

Captain Thompson, similarly testifying for the Government, was asked for his opinion concerning whether accused could adhere to the right. He answered:

"This is a point where I find some difficulty in the terms of the definition. However, using the definition as set down in this AFM 160–42, I'd have to conclude that he was able to adhere to the right."

The witness referred in particular to "this rather rigid definition of the immediate detection that was in question."

The law officer incorporated in his instructions the concept contained in the Air Force Manual and advised the members, among other things:

". . . If the accused would not have committed the act had the circumstances been such that immediate detection and apprehension were certain he cannot be said to have acted under an irresistible impulse."

The Government concedes that this Court has frequently condemned the use of Air Force Manual 160–42 in judicial proceedings. See United States v Schick, 7 USCMA 419, 22 CMR 209; United States v Gray, 9 USCMA 208, 25 CMR 470; United States v Allen, 11 USCMA 539, 29 CMR 355. It contends, however, that, in the case before us, no impermissible reference was made to the work in question, the witnesses simply indicating some disagreement with the "legal concept" embraced in paragraph 5 concerning inability to adhere to the right, *i. e.,* "the compulsion generated by the illness was so strong that the act would have been committed even though the circumstances were such that the accused could expect to be detected and apprehended forthwith when the offense was committed." Cf. United States v Smith, 5 USCMA 314, 17 CMR 314; United States v Kunak, 5 USCMA 346, 17 CMR 346; United States v Covert, 6 USCMA 48, 19 CMR 174. The error into which the United States falls is relying upon cases, the validity of which has long since been impugned, and in denominating as a "legal" concept that which cannot be made binding upon expert witnesses or members of a court-martial in expressing an opinion or making a finding concerning the mental responsibility of an accused.

Military law has long held to the standard that an accused is mentally responsible for criminal behavior if he was, at the time, so far free from mental defect, disease, or derangement as to be able concerning the particular act charged both to distinguish right from wrong and to adhere to the right. Manual for Courts-Martial, United States, 1951, paragraph 120*b*; United States v Smith, supra; United States v Kunak, supra. This is a principle of law with which no one in this case evinces the slightest disagreement or for which any substitute is urged. Contrary to the criticism of many medical experts, it evaluates responsibility in the terms of the extent to which society is willing to excuse criminality of one's conduct on the basis of mental disturbance. And the difficulties which have been encountered in other jurisdictions establish the wisdom of making haste slowly in an area in which eminent authorities

so often disagree on the moral question of the extent to which we should permit escape from punishment in light of abnormalities of the mind. Cf. Durham v United States, 214 F2d 862 (CA DC Cir) (1954); McDonald v United States, 312 F2d 847 (CA DC Cir) (1962).

While forensic psychiatrists have sometimes misunderstood the real meaning of this traditional test for mental responsibility and the fact that it is essentially a measuring rod for societal forgiveness, so have we occasionally indulged ourselves in observations concerning purely medical matters. It is an early such transgression, we believe, that colors the Government's argument before us.

In United States v Smith, supra, a majority of this Court, as then constituted, discussed at length the legal effect and role of TM 8–240, Psychiatry and Military Law, September 1950, the predecessor publication to that now before us, and concluded it was entitled to some weight as "an official interpretation of the standards set out in the Manual for Courts-Martial . . . [although] . . . the Technical Manual in question was [not] of itself in any way binding on this Court, nor intended to be controlling on either a court-martial or an expert witness." United States v Smith, supra, at page 331. After lengthy discussion, however, and reference to various forensic psychiatric texts, the Court went on to approve of the language of the *current* Technical Manual regarding the irresistibility of an impulse in light of probable apprehension and punishment. It suggested the Manual "be utilized as a guide for instructions and the like." The Court also approved of judicially noting the publication and its extended use in the cross-examination of a defense expert witness. Chief Judge Quinn dissented and noted that, as here, prosecution expert witnesses testified to the accused's mental responsibility not upon their own knowledge and medical experience but in accordance with the Technical Manual's strictures.

In the *Kunak* case, supra, similar conclusions were reached by the Court, and again an instruction to the members embodying the concept of immediate detection and apprehension was approved. Once more, Chief Judge Quinn disagreed strongly with permitting unlimited use of the Technical Manual by courts-martial. Pointing out that it is at most "a textbook or treatise," he expressed the soundly conceived view that it had no probative value as such. *Kunak*, supra, at page 370. He also strongly questioned the validity of the purported test for existence of an inability to adhere to the right and traced its development to Lord Bromwell's acid comment that he " 'supposed the [defendant's] impulse was irresistible only in the absence of a policeman.' " People v Hubert, 119 Cal 216, 51 Pac 329, 331 (1897). The Chief Judge concluded, at page 372:

"Plainly Lord Bromwell's supposition was not intended to establish a definitive test for the existence of an irresistible impulse. In any event, neither the English nor California law recognizes the doctrine, and it would be ironic indeed to use these cases as authority for the legal criteria for establishment of the defense."

Much, of course, has occurred since the Court's decisions in United States v Smith and United States v Kunak, both supra. In United States v Schick, supra, the Court adopted the Chief Judge's earlier dissent and held "at most the 'Tech Manual' occupies the position of a text book or treatise on the subject of insanity." *Id.*, page 424. In United States v Gray, supra, we unanimously reiterated that conclusion, stating that it might be used as an aid in framing instructions, provided a "high degree of selectivity" was used. *Id.*, page 212. We specifically adverted to the fact that the "instructions given were not in conflict with the psychiatric testimony introduced by the defense." Finally, in United States v Allen, supra, we condemned the prosecution's use of the Technical Manual on cross-examination of defense expert witnesses and in argument to impress upon the court that "accused's defense of insanity lacked merit solely because it did not fall within the principles 'officially'

espoused in the publication." *Allen,* supra, at page 542. In so holding, we saw no need to answer an inquiry certified by The Judge Advocate General concerning references to the so-called "policeman at the elbow" test.

It will be seen, therefore, that little vitality remains to our original decisions in *Smith* and *Kunak,* both supra. We have now thrice marked out the limited value of AFM 160–42 in trials by courts-martial. Indeed, even in the earliest case, the late Judge Brosman saw fit to point out that we at no time believed it "to be controlling on either a court-martial or an expert witness." United States v Smith, supra, at page 332. Yet, it cannot be gainsaid that the Government's expert witnesses in this case thought themselves bound to apply the Manual's strict definitions and to find the accused not unable to adhere to the right because he would not, according to them, have written the checks involved in the face of immediate detection and apprehension. Has the endorsement of the principle in United States v Kunak and United States v Smith, both supra, survived the partial reversal of those decisions in United States v Schick; United States v Gray; and United States v Allen, all supra? We think not.

The so-called "policeman at the elbow" test embodied in the Air Force Manual is not, in reality, a governing legal principle, but merely a critical observation made long ago in light of the limited psychiatric knowledge then available. It is no more than a truism which declares that an impulse which can be resisted is not irresistible. It has been used to criticize use of the legal standard of inability to adhere to the right. Burdick, Law of Crime, § 213b (1946). It has received favorable attention from some experts. Hoch and Zubin, Psychiatry and the Law, page 63 (1955); Nice, Crime and Insanity, page 35 (1958). It has also been the subject of objection by authorities who point out it is inaccurate to refer to the test as an irresistible impulse and that use of the phrase "inability to adhere to the right"—as stated in military law—is more proper. Guttmacher and Weihofen, Psychiatry

and the Law, page 410, *et seq* (1952). Indeed, it has been noted that Lord Bromwell's dry statement was followed by his opposition to any recognition of the exculpatory doctrine of inability to adhere to the right. Glueck, Law and Psychiatry: Cold War or *Entente Cordiale?* page 51 (1962). See also Davidson, Forensic Psychiatry, page 13, (1952).

The fact of the matter is, as Chief Judge Quinn long ago noted, that no jurisdiction to which our attention has been called requires, as a sub-test, that the jury find the accused was so diseased mentally that he would be unable to refrain from the charged misconduct in face of the risk of immediate detection and apprehension. The entire theory of this seemingly plausible statement is based upon opposition to the extension of the original right-wrong standard to embrace inability to adhere to the right, and its adoption has had the effect of placing both expert witnesses and the fact finders in a straitjacket concerning application of our long recognized standards of mental responsibility. Indeed, it has "virtually deleted the doctrine of irresistible impulse from military law." United States v Kunak, supra, dissenting opinion of Chief Judge Quinn, at page 374. We think it far better to leave medical experts unfettered in expressing an opinion to the court members concerning whether one is able to adhere to the right. The fact finders similarly should be free to accept or reject their testimony. This Court's function and that of the law officer is limited to denominating the legal test for mental responsibility. Within the confines of that standard, forensic psychiatrists should be left to examine the evidence, correlate it with their expertise, and deliver to the court-martial their respective views concerning the accused's culpability. As has been noted, the existence of an inability to adhere to the right "must, in the nature of things, be a pure question of fact, not of law. . . . Nor has any court the authority, whatever the private view of the incumbent of the bench, to exclude evidence of any fact which the law has made a complete defense." 1 Bishop,

A Treatise on Criminal Law, Ninth Edition, § 387. We hold, therefore, that the accused's ability to adhere to the right in the face of the prospect of immediate detection and apprehension is not the legally controlling consideration in determining whether he is mentally responsible. The ultimate test for mental responsibility is ability to distinguish right from wrong and to adhere to the right, and, while the hypothetical effect of immediate detection and apprehension may play a proper role in cross-examination and as a factor to be considered by the court-martial in its deliberations on the issue, it cannot be made the subject of a governing instruction or used to limit the testimony of expert witnesses. Cf. United States v Smith, 13 USCMA 471, 479, 33 CMR 3; United States v Hayden, 13 USCMA 497, 498, 33 CMR 29. As such was the categorical advice given the court here, reversal must follow.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Air Force. A rehearing may be ordered.

Chief Judge QUINN and Judge KILDAY concur.