UNITED STATES, Appellee

v

GILBERT L. VAUGHN, Airman Second Class,
U. S. Air Force, Appellant

17 USCMA 520, 38 CMR 318

No. 20,843

May 10, 1968

■■■■■■■■■■■■

*Lieutenant Colonel Samuel C. Wexler* argued the cause for Appellant, Accused. With him on the brief was *Colonel Dwight R. Rowland.*

*Major Robert W. Vayda* argued the cause for Appellee, United States. With him on the brief was *Colonel James R. Thorn.*

## Opinion of the Court

FERGUSON, Judge:

Tried before a special court-martial convened at Vandenberg Air Force Base, California, the accused pleaded guilty to five specifications of larceny, in violation of Uniform Code of Military Justice, Article 121, 10 USC § 921. He was duly found guilty and sentenced to bad-conduct discharge, forfeiture of $86.00 per month for two months, confinement at hard labor for two months, and reduction. Intermediate appellate authorities affirmed, and we granted accused's petition for review upon the issues whether his pleas of guilty were providently made and whether the president's instructions on the sentence were adequate.

I

The five specifications of larceny to which accused pleaded guilty alleged that he took a tape recorder, amplifier, turntable, tape decks, a radio, and a stereo tape player, on March 31, 1967, April 11, 1967, April 17, 1967, April 22, 1967, and April 27, 1967. Other evidence indicated these items were obtained at night from a barracks and various automobiles.

In mitigation and extenuation, evidence was presented as to accused's impeccable prior record as an outstanding airman; his ability as a supply specialist; the fact that he had twice won awards for his distinguished service; and other matters regarding his fine performance and character.

A psychiatrist, Captain William B. Drummond, was also called as a defense witness. He declared that he had evaluated the accused both prior to and after the alleged offenses. He originally examined Vaughn after he had been found outside his barracks in poor condition and admitted to the hospital. He concluded accused suffered from various disorders, characterized by his obsession with hard work, "to the point of exhaustion." He considered recommending him for administrative separation but desisted upon being informed by accused's commander that his unit preferred "to allow him to continue doing his work and his extra hard work was an advantage."

Subsequently, as a result of a personality clash, accused was transferred from the position in which he worked so hard to a routine job in supply. Thereafter, he again consulted Dr. Drummond, but "did not know exactly what his trouble was." Finally, Drummond examined him in June 1967, at the behest of his commanding officer, in order to determine his responsibility in connection with the pending court-martial proceeding. At that time, and at the time of trial, he opined accused knew the difference between right and wrong and had the ability to adhere to the right, though the latter was impaired. Basically, the accused was a person with an obsessive compulsive personality and obsessive compulsive reaction, who normally found an outlet in hard, repetitive work. When transferred to a routine job and thus deprived of his outlet, he resorted to the repetitive act of stealing items which he did not want and for which he did not have any use, in order to relieve his anxieties.

In discussing accused's condition, Dr. Drummond declared that he relied on Air Force Manual 160–42, entitled "Psychiatry in Military Law." Accused's responsibility was evaluated by the standards therein laid down. Thus, Vaughn was not, at the time of the alleged offenses, suffering from an irresistible impulse, as:

"The manual states in determining irresistible impulse in the question of psychoneurosis and its effect on mental responsibility, it says these three questions should be answered. The first question is that the act is part of a repeated psychoneurotic

**521**

pattern, and my answer to this would be yes, an obsessive compulsive pattern. The second question is did the accused exhibit mounting anxiety or tension which was relieved by the theft or whatever the compulsion was. My answer to this would also be yes, he did get relief from the act as noted by the gnawing feeling in his stomache [sic] which was relieved. The third question is was the compulsion generated by the illness so strong that the act would have been committed even though the circumstances were such that the accused could expect to be detected and apprehended forthwith when the offense was committed. My answer to this would have to be no because I do not think that the compulsion was so strong that he would have committed the act regardless of the circumstances. For example, some stealth was used and he was able to restrain his acts sufficiently so he did not perform them at a time when he might have been observed. Paragraph five says for practical purposes, true irresistible impulse of inability to adhere to the right occurs only in psychotics. I do not feel Airman Vaughn is psychotic because he did not exhibit psychotic behavior at the time of my examinations."

Freed from the restraints imposed by the "Tech Manual," and based upon the bifurcate test of finding accused had a repeated psychoneurotic pattern and mounting anxiety relieved by his compulsive acts, Dr. Drummond was of the opinion "Airman Vaughn would be acting under an irresistible impulse."

The accused testified in his own behalf regarding his background and the circumstances surrounding the offenses to which he had pleaded guilty. He indicated he had worked hard in his former position, and had received awards for his performance. Nevertheless, difficulties developed with a new officer-in-charge, when, despite his efforts, the latter told him "my work was not up to par" and threatened him with an administrative discharge. Subsequently, he was transferred without explanation to a routine supply position,

though he was a highly qualified and skilled computer clerk.

Thereafter, he suffered stomach pains at night and would go for a walk to relieve them. During these walks and without prior planning or intent, he would see the items involved and "just take them." Such action relaxed him and "took that knot out of my stomache [sic]." He made no attempt to sell, trade, or use the items taken. "I just had them. I wasn't doing anything with them. They were just in the room." Until accused "would wake up and have them in my room," he had no awareness that he was "breaking the law" or "doing wrong."

On cross-examination, accused's understanding of what he had done was further expanded:

"Q. Airman Vaughn, you have testified that you stole these, took these articles, shall we say, from the rightful owner in the course of a nightly walk you would take, is this correct?

"A. Yes, sir.

"Q. And you also testified that, I believe, that your feeling of right or wrong would not impress itself on you until you were back in your barracks, is that correct?

"A. No, sir, that is not correct.

"Q. What is correct?

"A. When I would actually realize I had the item.

"Q. After the first time this happened and you got back to the barracks and you had an item and it was wrong and you had taken this on a nightly walk, the next nightly walk, did it occur to you you might do it again?

"A. I didn't go out on nightly walks.

"Q. The second time when you went on one of these walks when you awakened, didn't it occur you had stolen the last time and you might steal again?

"A. No, sir, it didn't.

"Q. What about the third time you went on your nightly walk, and the last two times you had stolen an ar-

ticle, did it occur to you then that you might take something, that your nightly walks might have some kind of connection where you would find yourself back in the barracks with items like this?

"A. No, sir.

"Q. When you took these nightly walks, Airman Vaughn, were you dressed in uniform normally or nighttime wear?

"A. Yes, sir, sometimes I was.

"Q. Sometimes you were. And how would you characterize these walks? Would you characterize them as open walks around the barracks area, around the parking lot to the dining hall, wherever you walked, or would they be furtive? Would you try to stay in the shadows?

"A. Right out in the middle of the street.

"Q. Right out in the middle of the street. Was it so above board, shall we say, that anybody who was watching would have seen you?

"A. Yes.

"Q. Did you avoid bright lights?

"A. No, sir.

"Q. When you—you always did these on these walks. Anything you took, you took on a walk at night to relieve your internal anxiety, is this true?

"A. Yes.

"Q. Do you remember where you acquired this Sony tape recorder?

"A. It was out of the barracks, sir.

"Q. How about this tuner?

"A. That—all three came from the same place, sir.

"Q. This also was on one of these nightly walks?

"A. I don't recall when I picked those items up, sir.

"Q. You don't recall when you got these items?

"A. Any of the items, sir.

"Q. You don't recall when you got any of them but you did assume, did you not, from your previous testi-mony, that you picked these up on one of your nightly walks?

"A. Yes.

"Q. And these were the items you picked up on your above board walk. You simply walked in somebody else's room and—how do you know you took it from the barracks room?

"A. I read the stipulation.

"Q. That is the only way you know?

"A. Yes."

## II

The Government, referring prin-cipally to the testimony of the defense psychiatrist, urges no issue of sanity is raised and, in consequence, the pleas of guilty are provident. The defense, on the same basis, urges the pleas clearly should not have been received.

It is basic military law, and we have many times so held, that, if an accused enters a plea of guilty and thereafter sets up matter inconsistent with the plea, "a plea of not guilty shall be en-tered in the record, and the court shall proceed as though he had pleaded not guilty." Code, supra, Article 45, 10 USC § 845; United States v Thompson, 13 USCMA 395, 32 CMR 395; United States v Stanaway, 12 USCMA 552, 31 CMR 138; United States v Epperson, 10 USCMA 582, 28 CMR 148. In the event such inconsistent matter is set up by the accused, it is the duty of the court to inquire into the question and determine whether the plea or the statement is to be withdrawn. Manual for Courts-Martial, United States, 1951, paragraph 70b; United States v Mc-Coy, 12 USCMA 68, 30 CMR 68.

Turning to the case before us, it is clear that, after entering the pleas, ac-cused set up matters totally inconsist-ent with his guilt. Denying any intent or purpose to steal, he emphasized that his actions were wholly outside his con-trol and that he had no knowledge of the circumstances of the takings until he read the stipulation into which he entered with the Government. Cf. United States v Holladay, 16 USCMA 373, 36 CMR 529. He only knew that the items were in his room when he awoke on each occasion and, only then,

did he realize that he had wronged someone. Under the circumstances, it would be hard to demonstrate a clearer statement of an unmotivated, unconscious, and unintentional series of acts on the part of an accused, completely at odds with any notion of legal culpability. In short, accused's whole testimony fairly shouts that he had no intent to steal—indeed, no control over his actions—and, when presented to the court, it was the president's duty immediately to make further inquiry into the providence of the pleas. Manual, supra, paragraph 70b; United States v Thompson, supra.

Finally, we note the accused's version of what transpired is largely supported by the psychiatric testimony offered in his behalf. True, as the Government notes, such was stated not to be introduced for the purpose of raising an issue of responsibility, but, regardless of counsel's statement, it undoubtedly had that effect. Thus, Dr. Drummond testified that his belief accused's ability to adhere to the right was only impaired, was based on formalistic adherence to the standards laid down in Air Force Manual 160–42, including the so-called "policeman-at-the-elbow" test which we have so many times condemned. See United States v Jensen, 14 USCMA 353, 34 CMR 133; United States v Allen, 11 USCMA 539, 29 CMR 355; United States v Gray, 9 USCMA 208, 25 CMR 470; and United States v Schick, 7 USCMA 419, 22 CMR 209. Indeed, counsel's statement that he did not intend to place responsibility in question seemed also to consider this "Tech Manual" binding on the witness and to be framed within its context. Shorn of its limitations, "which cannot be made binding upon expert witnesses . . . in expressing an opinion," United States v Jensen, supra, at page 355, Drummond's view states that accused's act was one irresistibly impelled by his mental condition. As such, it would clearly raise an issue of accused's responsibility for his acts, as well as his capacity to entertain the intent requisite to a conviction of larceny. In short, considered with accused's testimony, we are compelled to conclude that considerable matters inconsistent with his pleas of guilty were set up by the defense and, as such, require invalidation of the findings of guilty. United States v Thompson; United States v Holladay, both supra.

In light of the foregoing, we need not comment at length on the assertion that the limited instructions of the president on the sentence were prejudicially erroneous. Suffice it to say that, if a rehearing is held and similar evidence offered by the accused in the event of conviction, the matter may be appropriately corrected in conformity with our opinion in United States v Wheeler, 17 USCMA 274, 38 CMR 72.

The decision of the board of review is reversed, and the record of trial is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered.

Chief Judge QUINN and Judge KILDAY concur.